## CHOCTAW NATION *v.* UNITED STATES.
## UNITED STATES *v.* CHOCTAW NATION.

### APPEALS FROM THE COURT OF CLAIMS.

Argued October 19, 20, 21, 1886. — Decided November 15, 1886.

The relations between the United States and the Indian tribes, being those of a superior towards an inferior who is under its care and control, its acts touching them and its promises to them, in the execution of its own policy and in the furtherance of its own interests, are to be interpreted as justice and reason demand in cases where power is exerted by the strong over those to whom they owe care and protection. *United States v. Kagama,* 118 U. S. 375, cited and applied.

The Act of March 3, 1881, 21 Stat. 504, authorizing the Court of Claims " to take jurisdiction of and try all questions of difference arising out of treaty stipulations with the Choctaw nation, and to render judgment thereon," and granting it power to review the entire question of differences, de novo, and providing that " it shall not be estopped by any action had or award made by the Senate of the United States in pursuance of the Treaty of 1855," denied to that award conclusive effect as *res judicata,* but did not set it aside, or deny to it, effect as prima facie evidence of the validity of the claims adjudged by it. The act operated to reopen that award and the questions decided by it so far as to cast upon the United States, in the trial in the Court of Claims, the burden of disproving the justice and fairness of the award.

By the terms of the submission in the Treaty of June 22, 1855, 11 Stat. 611,

VOL. CXIX—1

under which the Senate acted as arbitrator of the differences between the United States and the Choctaws, it was clearly submitted to that body to determine whether, under all the circumstances, and as a matter of justice and fair dealing, the Choctaws ought to receive the proceeds of the sale of the lands ceded by them to the United States by the Treaty of September 27, 1830, 7 Stat. 333, whether as deducible from the terms of the treaty, or as a just compensation to be awarded to them for its breaches. The delegation by the Senate to the Secretary of the Interior to ascertain and report the detailed sums due the Choctaws upon the principles settled by the award was within the powers conferred upon that body by the terms of the submission. No notice to the United States was necessary of the intention of the Senate to proceed as arbitrator under the submission. And the whole proceedings were ratified and confirmed by the United States by the Acts of March 2, 1861, 12 Stat. 238; and of June 23, 1874, 18 Stat. 230.

The award of the Senate upon the differences between the Choctaws and the United States submitted to it under the provisions of the Treaty of June 22, 1855, furnishes the nearest approximation to the justice and right of the case that, after the lapse of time, it is practicable for a judicial tribunal to reach; and, not being affected by any of the facts found by the Court of Claims, is taken by this Court as 'the basis of its judgment on the subjects in dispute in this case, which arose prior to the treaty of 1855, and were passed upon in the award. In addition to the amount of that award, the Choctaw nation is entitled to further sums, (1) for unpaid annuities; and (2) for land taken from them in locating the boundary of Arkansas under the Act of March 3, 1875, 18 Stat: 476.

The following is the case as stated by the court:

There are two appeals in this case, one by the Choctaw Nation, and the other by the United States, from a judgment rendered by the Court of Claims in favor of the former for the sum of $408,120.32. Jurisdiction of the cause was conferred upon that court by the provisions of an act of Congress approved March 3, 1881, 21 Stat. 504, entitled "An act for the ascertainment of the amount due the Choctaw Nation," as follows:

"That the Court of Claims is hereby authorized to take jurisdiction of and try all questions of difference arising out of treaty stipulations with the Choctaw Nation, and to render judgment thereon; power is hereby granted the said court to review the entire question of differences *de novo*, and it shall not be estopped by any action had or award made by the

Senate of the United States in pursuance of the treaty of eighteen hundred and fifty-five; and the Attorney General is hereby directed to appear in behalf of the Government; and if said court shall decide against the United States, the Attorney General shall, within thirty days from the rendition of judgment, appeal the cause to the Supreme Court of the United States; and from any judgment that may be rendered the said Choctaw Nation may also appeal to said Supreme Court: *Provided*, The appeal of said Choctaw Nation shall be taken within sixty days after the rendition of said judgment, and the said courts shall give such cause precedence.

" Sec. 2. Said action shall be commenced by a petition stating the facts on which said nation claims to recover, and the amount of its claim; and said petition may be verified by either of the authorized delegates of said nation as to the existence of such facts, and no other statements need be contained in said petition or verification."

In pursuance of this act, the Choctaw Nation filed its original petition on the 13th of June, 1881, which was subsequently amended by new pleadings filed February 26, 1884. The questions of difference between the United States and the petitioner, it was alleged, resulted from the non-performance and non-fulfilment by the United States of the obligations assumed by it under various treaties between the United States and the Choctaw Nation, including those of the following dates, to wit: the 18th day of October, 1820, the 20th day of January, 1825, the 27th day of September, 1830, the 22d day of June, 1855, and the 28th day of April, 1866.

By the terms of the treaty of October 18, 1820, 7 Stat. 210, it was provided, amongst other things, that the Choctaw Nation did cede to the United States all that part of its lands situated in the State of Mississippi described in the 1st article of the treaty, in consideration whereof the United States stipulated that in part satisfaction for the said cession the United States ceded to the Choctaw Nation a tract of country west of the Mississippi River, situated between the Arkansas and Red Rivers, the boundaries of which were therein described; and also that the boundaries thereby established between the

Choctaw Indians and the United States, east of the Mississippi River, should remain without alteration until the period at which the nation should become so civilized and enlightened as to be made citizens of the United States. It was agreed that Congress should lay off a limited parcel of land for the benefit of each family or individual in the nation; that all those who had separate settlements falling within the limits of the land ceded by the Choctaw nation to the United States, and who desired to remain there, should be secured in a tract or parcel of land one mile square, to include their improvements; and that those preferring to remove within one year from the date of the treaty should be paid their full value, including the value of any improvements.

It is alleged in the petition that, by the treaties of January 20, 1825, 7 Stat. 234, of September 27, 1830, 7 Stat. 333, and of June 22, 1855, 11 Stat. 611, the boundary line between the lands of the United States and the Choctaws west of the Mississippi River was established, but that the United States, in fixing and causing to be surveyed the said boundary line, did not pursue the line in accordance with the provisions of the said treaties, but encroached upon and took from the lands ceded to the Choctaw Nation a quantity of land amounting to 136,204.02 acres, which by the legislation of the United States, in violation of these provisions of the treaties, became a part of the public domain of the United States, for which the Choctaw Nation are entitled to recover their value, estimated at $167,896.57.

The petition further states that, in the treaty concluded on the 27th September, 1830, called the Treaty of Dancing Rabbit Creek, it was provided, among other things, by the 3d article thereof, 7 Stat. 333, that the Choctaw Nation should and did thereby cede to the United States the entire country they then owned and possessed east of the Mississippi River, and agreed to remove beyond the Mississippi River as early as practicable; and that, in pursuance of this treaty the Choctaw Nation surrendered to the United States all the remaining lands at that time owned by them in the State of Mississippi, amounting, as is alleged, to 10,423,139 acres, and, in compliance with the

treaty on their part, commenced to remove, and did remove, within the time stipulated therein, or within a reasonable time thereafter, from the said lands to the lands purchased and acquired by them under the terms of the treaty of October 18, 1820.

By the 14th article of the treaty of September 27, 1830, it was provided that each Choctaw head of a family, being desirous to remain and become a citizen of the States, should be permitted to do so by signifying his intention to the agent within six months of the ratification of the treaty, and thereupon should be entitled to a reservation of one section of 640 acres of land, to be bounded by sectional lines of survey; and in like manner should be entitled to one half that quantity for each unmarried child living with him over ten years of age, and a quarter section for each child that might be under ten years of age, to adjoin the location of the parent. If they resided upon such lands, intending to become citizens of the States, for five years after the ratification of the treaty, a grant in fee simple should issue. Such reservation should include the present improvement of the head of the family, or a portion of it, and the persons who claimed under the article were not to lose the privilege of Choctaw citizenship.

It is alleged in the petition that 1585 heads of Choctaw families signified their intention to remain on their lands in Mississippi and become citizens under this article of the treaty; and that, although they substantially complied with all its requirements and conditions, and thereby became entitled to grants of land in fee simple, as specified in the article, yet but 143 such families ever received from the United States their title to the lands guaranteed them by the article, leaving 1442 of the said Choctaw heads of families entitled to a grant of their lands in fee simple, under the provisions of said article 14, whose claims had not been satisfied.

It is alleged in the petition that the lands to which these families were entitled amounted to 1,672,760 acres, which were reasonably worth, with the improvements, $5.50 an acre, and that the value of the whole was $9,200,180.

It is further alleged in the petition that the United States,

having failed to secure to each Choctaw head of a family the reservation secured under article 14 of the treaty of 1830, subsequently, by an act of Congress approved August 23, 1842, 5 Stat. 513, attempted to provide compensation for the same by the issue and delivery of certificates or scrip, which authorized those entitled to such reservations, or their assignees, to enter any of the public lands subject to entry at private sale in the States of Mississippi, Alabama, Louisiana, or Arkansas, which certificates or scrip they were required by said act to receive and accept in full satisfaction of all their claims or demands against the United States under said article 14.

It is further alleged in the petition that 292 of the 1442 Choctaw heads of families, entitled to grants in fee simple under article 14 of the treaty of 1830, have never received any such grants in fee simple, or any allowance or compensation whatever for the same. The claims of 1150 of said 1442 heads of families were adjudicated and allowed under the act of August 23, 1842, and certificates or scrip awarded to them under the provisions of said act, authorizing the entry of 1,399,920 acres of land, of which there were paid and delivered to the persons entitled to receive the same 3833 certificates or pieces of scrip, authorizing the entry of 700,080 acres of land. The certificates for the residue of said 1,399,920 acres, to wit, for 699,840 acres, were not issued, but were withheld under an act of Congress approved March 3, 1845, 5 Stat. 777, which provided that they should carry an interest of five per cent., payable to the claimants or their representatives, to be estimated upon $1.25 for each acre of land to which they were entitled. The aggregate amount, or principal sum, thus funded, amounting to $872,000, was afterwards, under an act of Congress approved July 21, 1852, 10 Stat. 19, paid in money to the claimants; which sum of $872,000 was included in the sum of $1,749,900 subsequently charged to the claimants in an account referred to hereafter, being for 1,399,920 acres of scrip, in lieu of reservations, at $1.25 per acre; of which sum of $1,749,900, $872,000 was paid as aforesaid in money, the residue, $877,900, being charged in said account for the certificates or scrip authorizing the entry of 700,080

acres of land, delivered as aforesaid to the said claimants; for which 700,080 acres in scrip the said claimants were charged at the rate of $1.25 per acre, although, by reason of the acts of the United States and its agents in delivering said scrip at places where it could not be used, the whole amount realized by the claimants was $118,400, and no more. So that the amount chargeable against the Choctaw Nation should have been the sum of $980,400, and is all that should be deducted from the $9,200,180, the estimated value of the lands for which they claim the right to recover in this proceeding.

It is further alleged that, by the 16th article of said treaty, the United States agreed to remove the Choctaws to their new homes; to furnish them with ample corn, beef, and pork for twelve months after reaching there; to take all of their cattle at an appraised value, and pay for the same in money; but it is alleged that, between 1834 and 1846, 960 members of the Choctaw Nation emigrated and subsisted for one year without assistance from the United States, for each of which 960 the Choctaw Nation is entitled to recover $54.16½ from the United States, making the total amount claimed $51,998.40.

It is further alleged that, under the provisions of article 19 of said treaty of 1830, four sections of land were reserved to Col. David Folsom, two of which should include his present improvement; two sections each were reserved to eight persons therein named, to include their improvements, and to be bounded by sectional lines, which might be sold with the consent of the President; and for others not otherwise provided for, there were reserved, 1st, one section to each head of a family, not exceeding forty, who had in actual cultivation fifty acres or more, with a dwelling-house thereon; 2d, three quarter-sections, after the manner aforesaid, to each head of a family, not exceeding 460, who had cultivated between thirty and fifty acres; 3d, one half-section, as aforesaid, to those, not to exceed 400, who had cultivated from twenty to thirty acres; 4th, a quarter-section to such, not to exceed 350, as had cultivated from twelve to twenty acres; and half that quantity to such as had cultivated from two to twelve acres, limited

to the same number; each class to be so located as to include the improvement containing the dwelling-house. These reservations might be sold with the consent of the President of the United States; but should any prefer it, or omit to take such reservation as he might-be entitled to, the United States would, upon his removal and arrival at his new home, pay him fifty cents an acre therefor, provided proof of his claim be made before the 1st of January following.

It is further alleged that said article 19 intended to provide 458,400 acres for 1600 cultivators, yet in carrying out the treaty land was assigned to but 731, amounting in all to 123,-680 acres; that the actual number of cultivators of from two to twelve acres at the date of the treaty was 1763, instead of 350; that 1413, therefore, failed to get any land at all, owing to the limitations of said article 19; that while the treaty intended to provide reservations for 1600 cultivators, such reservations were assigned to only 731, although the number of actual cultivators was 2144; that the 1413 cultivators thus excluded contended that they were justly entitled to the same measure of compensation for their improvements as was allowed to other cultivators of equal grade, to wit, 80 acres to each, amounting to 113,040 acres, worth at that time $339,120; that of the 731 to whom were assigned lands as aforesaid, 143 had never received any land or other benefit intended to be secured by said article 19; 45 of whom relinquished to the United States 6400 acres of land and never received compensation therefor, and the remaining 98, to whom 15,520 acres of land were assigned, never had any land set apart for them; that the said 143 cultivators were entitled to 21,920 acres, worth the sum of $65,760.

It is further alleged that article 20 of said treaty of 1830 provided for each warrior who emigrated, a rifle, moulds, and ammunition; that 1458 warriors became entitled to the benefits of article 20, but they were never received by a large number who emigrated; that such articles were worth at that time $13.50 to each warrior, and that the whole amount claimed, by the failure of the United States to carry out the provision of said article 20, was $19,278.

It is further alleged that the act of Congress, making appropriation for the expenses of the Indian Department, and for fulfilling treaty stipulations with the various Indian tribes, for the year ending June 30, 1846, approved March 3, 1845, 5 Stat. 777, provided as follows:

"That of the scrip which has been awarded, or which shall be awarded, to Choctaw Indians under the provisions of the law of twenty third August, one thousand eight hundred and forty two, that portion thereof not deliverable East, by the third section of said law, in these words, 'not more than one-half of which shall be delivered to said Indian until after his removal to the Choctaw territory west of the Mississippi,' shall not be issued or delivered in the West, but the amounts awarded for land on which they resided, but which it is impossible for the United States now to give them, shall carry an interest of five per cent., which the United States will pay annually to the reservees under the treaty of one thousand eight hundred and thirty, respectively, or to their heirs and legal representatives forever, estimating the land to which they may be entitled at one dollar and twenty five cents per acre."

That the Choctaw heads of families and their children became entitled to receive scrip for 697,600 acres of land, valued at $872,000; that said Choctaw heads of families, their heirs and legal representatives, became entitled to interest thereon from March 3, 1845, but the United States refused to pay such interest unless the person entitled to receive it was at the date of the passage of said act settled in the Choctaw territory west of the Mississippi River, and also refused to pay such interest on scrip issued subsequent to March 3, 1845, until the beneficiary had removed to the Choctaw territory; that those persons for whose benefit the scrip was funded were entitled to interest on such funded scrip from March 3, 1845, until July 21, 1852, but the United States did not pay the interest on such funded scrip between those dates; and that the amount of such interest due from the United States was $305,551, but only $171,400.34 of interest was paid on such scrip, leaving due thereon $134,150.66.

It is further alleged that the Choctaw Nation, by the 4th article of the treaty of October 18, 1820, was secured in the right to occupy and enjoy forever the lands retained east of the Mississippi River, which were by the provisions of said article to be set apart to each family or member of the Choctaw Nation, when that nation should become so civilized and enlightened as to be made citizens of the United States; that the United States agreed, by the 7th article of the treaty of 1825, not to apportion said lands for the benefit of the Choctaw Nation but with the consent of that nation; that the legal effect of said article 4 of the treaty of 1820, and of article 7 of the treaty of 1825, was to secure to the heads of families and individual members of the Choctaw Nation a title in fee simple to all lands belonging to that nation not included in the cession made by the treaty of 1820, but that the United States having, by the treaty of 1830, disregarded the obligations of said articles 4 and 7, and having paid for said lands ceded by the Choctaw Nation, under the treaty of 1830, an inadequate consideration, the Choctaw Nation was entitled to be paid by the United States the whole amount of the proceeds resulting from the sale of said lands so ceded.

It is further alleged that the Choctaw Nation, by its legislative assembly, on November 9, 1853, created a delegation to settle all unsettled business with the United States; that on the 22d of June, 1855, the United States entered into a treaty with the Choctaw Nation to settle and adjudicate all matters of difference, claims, or demands of that nation, or individual members thereof; that subsequent to the ratification of said treaty by the United States, the Senate of the United States entered upon the examination and adjudication of the questions submitted to it by article 11 of that treaty, whereupon a statement of the claims and demands of the Choctaw Nation upon the United States, with supporting evidence, was presented to the Senate to enable it to give such claims a just, fair, and liberal consideration; that after consideration of such claims, the Senate, on the 9th of March, 1859, passed a resolution to allow the Choctaws the proceeds of the sale of such lands as had been sold by the United States on January 1,

1859, deducting therefrom the cost of survey and sale, and all proper expenditures and payments under the treaty of 1830, excluding the reservations allowed and secured, and estimating the scrip issued in lieu thereof at $1.25 per acre, and that they be allowed 12½ cents per acre for the residue of said lands.

It is further alleged that, in pursuance of said resolution, the Secretary of the Interior caused an account to be stated between the United States and the Choctaw Nation, showing that the United States were indebted to said nation, on account of the net proceeds of the lands ceded by the treaty of September, 1830, in the sum of $2,981,247.30.

It is also alleged that, under the treaty of June 22, 1855, 11 Stat. 611, in consideration of the claims heretofore stated, and of the cession and lease of 15,000,000 acres of land, valued at $2,225,000, the United States agreed that all the rights and claims of the Choctaw Nation, and the individuals thereof, and all matters in dispute, should receive a just, fair, and liberal consideration and settlement; that by virtue thereof the Choctaw Nation became entitled to a settlement of and payment for all their pending rights and claims, individual and national, free from all waivers or estoppels which might in equity have been interposed against them; and that, by virtue of article 11 of the treaty of June, 1855, and of the consideration paid to the United States therefor, the Choctaw Nation became entitled, by virtue of article 18 of the treaty of 1830, whenever well-founded doubts should arise, to have said treaty construed most favorably toward the Choctaws.

In said petition the Choctaw Nation prays that the award of the Senate of the United States be made final, and that the account stated by the Secretary of the Interior may be restated, in order that the balance due may be determined and the following errors corrected; that the proceeds of the lands sold up to January 1, 1859, and the residue then remaining unsold, at 12½ cents per acre, amounted to $8,413,418.61, instead of $8,078,614.80; that the actual cost of survey and sale was $256,387.74, instead of $1,042,313.96; that the sum of $120,826.76 for reservations to orphans was not deducted, included in or connected with the aggregate fund against which it is

charged in said account; that there should not have been deducted from said aggregate fund the payments made to meet contingent expenses of the commissioners appointed to adjust claims under the 14th article of the treaty of September, 1830, amounting to $51,320.79, nor the expenses growing out of the location and sale of Choctaw reservations, and perfecting titles to the same, amounting to $21,408.36; that the correction of the foregoing errors would show a balance payable to the Choctaw Nation, under the award of the Senate, of $4,295,-533.24, instead of $2,981,247.30, for which sum the Choctaw Nation prays judgment, after deducting $250,000 paid on account of said award under the act of March 2, 1861, and the further sum of $250,000 in bonds appropriated by said act; and also prays that interest be allowed on this latter sum at six per centum per annum from March 2, 1861, until paid.

It is further alleged that, under the act of Congress approved March 2, 1861, the Choctaw Nation became entitled to receive from the United States $250,000 in bonds bearing interest at six per centum per annum, as a payment on account of said award of the Senate of the United States; that the issue and delivery of said bonds was demanded by the Choctaw Nation in April, 1861, but said bonds were not and never have been issued and delivered to it, nor has it received from the United States any payment of money in lieu of said bonds; that said Choctaw Nation claims from the United States on account of said award the said sum of $250,000, with interest at six per centum per annum from the date when demand for said bonds was made until paid; that the claims of the Choctaw Nation against the United States, but for the adjudication thereof by the Senate, would amount to $8,432,349.78, for which the Choctaw Nation would be entitled to recover judgment, with interest at five per centum, from September 27, 1830; and that there remains due and payable to the Choctaw Nation from the United States on account of the award of the Senate, after deducting therefrom the said sum of $500,000, the sum of $3,795,533.24, on which the Choctaw Nation claims interest at five per centum per annum.

It is also alleged that, between July 1, 1861, and July 1,

1866, there became due from the United States to the Choctaw Nation, under various treaty stipulations made prior to July 1, 1861, the sum of $406,284.93, of which amount it is admitted the United States may legally retain $346,835.61, leaving a balance due of $59,449.32.

It is further alleged that the questions of difference existing between the Choctaw Nation and the United States result from the non-fulfilment of treaty stipulations, and relate exclusively to claims which can now only be satisfied by the payment of such sums as the United States ought under its treaties to pay to said Choctaw Nation, which are as follows: 1st, Claims upon the basis of the Senate award, and of the correctness of the account stated by the Secretary of the Interior May 8, 1860, amounting to $2,958,593.19, with interest on the balance due on the award of the Senate at five per cent., and on the bonds authorized by Congress at six per cent., until paid; 2d, Amount due under the award, after correcting errors in the account stated by the Secretary of the Interior, $4,272,879.13, to which add interest on balance due under the award of the Senate from March 9, 1859, at five per cent., and on bonds authorized by Congress from March 2, 1861, at six per cent., until paid; 3d, Amount claimed in case the award of the Senate, under article 11 of the treaty of June 22, 1855, should be set aside, $8,659,695.67, with interest on the 14th article claims of $7,808,668.80, from August 24, 1836, until paid; 4th, Claims of the Choctaw Nation against the United States, stated upon the principle that the United States retain the lands acquired by the treaty of September 27, 1830, in trust for the benefit of the Choctaw Nation, and, as trustee, are bound to account for the value of said lands, after deducting therefrom the amounts paid to the Choctaw Nation on account of said lands.

The petition further prays, that if none of the above methods of stating its claims against the United States are such as can be approved and sanctioned, and if the court may rightfully ignore the Senate award and examine the matter *de novo*, then the Choctaw Nation may be considered as having been required, in violation of the treaties of October, 1820, and

January, 1825, to cede to the United States the lands described
in the treaty of September, 1830, and that the court will de-
clare that the United States, from and after the treaty of
September, 1830, held such lands as the trustee for the benefit
of the Choctaw Nation, and were bound to account for the
proceeds resulting from the sale thereof; that the court will
ascertain the amount realized by the United States from the
sale of such lands, and cause an account to be stated in
respect thereto, and charge against the same the value of all
payments on account of said lands by the United States; that
upon such accounting a judgment may be rendered for the
balance found due, with interest thereon; and that the Choc-
taw Nation have judgment for the amount of the annuities
due to it from July 1, 1861, to July 1, 1866, amounting to
$59,449.32, and also for the sum of $167,896.57, being the
value of the lands taken from the Choctaw Nation by the
United States in locating the western boundary of the State
of Arkansas.

The United States, in addition to a general denial, filed a
special plea, alleging that by the 14th article of the treaty of
1830 each Choctaw head of a family who desired to remain in
Mississippi and become a citizen of the State was to be permit-
ted to do so upon signifying his intention to the agent of the
United States within six months from the ratification of the
treaty, whereupon he should be entitled to a reservation of
land including his improvement, and, should he live upon the
land for five years thereafter, a grant in fee simple should
issue to him. That within the six months 100 heads of Choc-
taw families signified their intention to remain and become
citizens of the States and their names were registered. That
on August 12, 1833, the ceded lands were directed to be sold,
and an agent was appointed to locate the reservations of those
intending to remain. That many who were not registered
applied for reservations, but were not recognized, yet, it ap-
pearing that they had signified their intention in due time and
been refused registry, the agent was directed to receive evi-
dence and make provisional locations of lands the sale of
which was suspended to await the action of Congress. That

commissioners were appointed to adjust the claims to reservations, and filed a report on June 16, 1845. That 143 heads of Choctaw families obtained reservations in the ceded territory, and 1155 other Choctaw heads of families were found to be entitled to the benefits of article 14 of the treaty, but the United States had disposed of the lands to which they would have been entitled, so that it was impossible to give said Indians the quantity to which they were severally entitled. Said commissioners thereupon estimated the quantity of land to which each of said Indians would be entitled and allowed him for the same quantity, to be taken out of any public lands in the States of Mississippi, Louisiana, Alabama, or Arkansas, subject to entry at private sale. That 1155 pieces of scrip, each representing one half the allowance of land, were issued to those entitled thereto, and were accepted in part payment for the lands aforesaid; that the remaining 1155 half pieces of scrip were reserved and interest paid thereon valued at $1.25 per acre to those entitled thereto, until the principal of $872,000 was paid upon the execution of a final release of all claims of such parties under the fourteenth article of the treaty. That thereby the claims of 1155 Choctaw heads of families were fully satisfied and discharged, and any further claim by or on behalf of them was forever barred. The plea prays that so much of the amended petition as sets forth a cause of action in behalf of said 1155 Choctaw heads of families for the value of lands alleged to be due them be dismissed.

To this special plea the Choctaw Nation filed a replication on April 22, 1884, which in substance denied the validity of the alleged release mentioned in the plea, on the ground that the same was wrongfully exacted under circumstances that made it inequitable for the United States to insist upon it as a bar to the claims of the Choctaw Nation covered by it.

The case having been heard before the Court of Claims, the court, upon the evidence, found the facts, which are set out in much detail. It is only necessary here to state the following:

The War Department, then having charge of Indian affairs, on May 21, 1831, instructed Colonel Ward, the Indian agent in Mississippi, on the subject of carrying into effect the treaty of

September 27, 1830. The correspondence between the depart
ment and its agents is set out fully. On June 26, 1833, Mr.
G. W. Martin was appointed by the War Department to make
selections of the locations of land granted to the Choctaws
under the 14th, 15th, and 19th articles of the treaty, and was
instructed to call on Ward and Major Armstrong, also an agent
of the United States, appointed under the treaty, for the regis-
try of the different classes so entitled. In pursuance of his
instructions, Mr. Martin located claims and received evidence
of claimants, and transmitted reports to the Secretary of War,
with a list of 580 claims for reservations under the 14th arti-
cle, and with affidavits as to forty claimants, showing imper-
fections in Ward's register, and that persons who sought to be
registered were refused, and not permitted to do so.

It was found as a fact by the Court of Claims that Ward
was unfit for the duties of the situation; that his conduct was
marked by acts calculated to deter the Indians from making
application; that he was abusive and insulting to them, pre-
venting them thereby from making application under the 14th
article of the treaty, in order to necessitate their going west of
the Mississippi. He insisted that the Indians had sold their
land; that he had been instructed to induce as many as possi-
ble to go west; and that more had been registered than had
been anticipated. After the 24th of August, 1831, the agents
of the United States insisted that those whose names were not
registered should go west, and that if they did not go soldiers
would be sent to drive them out; that they would take their
children from them; and many other threats were made by
them.

On the 31st of July, 1838, about 5000 of the Choctaw
Indians still remained in Mississippi; notwithstanding the
efforts of the removing agent of the government to remove
them, they remained, asserting their intention to do so, and
claiming the benefit of the 14th article of the treaty of 1830.
It was the intention of those remaining east of the Mississippi
to take the benefit of the 14th article of the treaty.

It was also found by the court that the whole number of
heads of families receiving land under the 14th article was

143; the number who established their rights under the act of Congress approved August 23, 1842, was 1150; and the number disallowed by the commissioner was 292. The commissioner rejected the claims of 191 heads of families under that act because they had no improvement on their reservations on the 27th of September, 1830, and did not reside on the same for five years continuously after said date. These 191 families complied, or attempted to comply, with the requirements of the 14th article within the time required by it, but were deprived of their rights under it by the agents of the United States. They were entitled to reservations amounting to 225,760 acres.

It was also found by the court that, under the provisions of the act of Congress approved August 23, 1842, the United States, having failed to grant to said Choctaw heads of families the lands which they and their children claimed under said treaty, and having disposed of the said lands, so that it was impossible to give said Choctaw heads of families the lands whereon they resided on the date of the treaty of 1830, did, between June, 1843, and November, 1851, issue and deliver to the said 1155 Choctaw heads of families, and to their children, the certificates or scrip provided for in said act, for 1,404,640 acres of land, which certificates or scrip the said Choctaw heads of families and their children were required by the United States to receive and accept in lieu of the reservations of land which, under the said 14th article of the treaty, they claimed. The United States refused to deliver to the said Choctaw heads of families and their children that one half of the scrip which might have been delivered to them under the provisions of the said act of Congress, east of the Mississippi River, until the said Choctaw heads of families and their children had either started for, or actually arrived in, the Choctaw territory west of the Mississippi River.

Under the act of Congress approved March 3, 1845, 697,600 acres in the said certificates or scrip, so directed to be delivered to the 1155 Choctaw heads of families and their children, were funded at the value of $1.25 per acre, with interest payable thereon annually forever at the rate of five per centum

per annum; which specified number of acres in certificates, funded under said act, was that part of said certificates which was not deliverable east to the said Choctaw heads of families and their children, and not until their arrival in the Choctaw territory west of the Mississippi River. This scrip, which was funded for the benefit of said Choctaw heads of families and their children, under the act of Congress of March 3, 1845, was funded by the United States at the rate of $1.25 an acre, amounting to the sum of $872,000, which sum was paid to the said heads of families and their children, or their legal representatives, under the provisions of an act of Congress approved July 21, 1852.

It was further found by the Court of Claims that the said Choctaw heads of families and their children, claimants under the 14th article of the treaty of September, 1830, were reduced to a helpless condition of want, which rendered it practically impossible for them to contend with the United States in their requirement that the said Choctaw heads of families should accept and receive the scrip provided to be issued to them, in lieu of the reservations, by the act of 1842, and the said scrip and the money paid to redeem the same were taken and accepted because they were powerless to enforce any demands against, or impose any conditions upon, the United States.

The Choctaw Nation, by its proper-authorities, on November 6, 1852, executed and delivered to the United States the following instrument, for the purposes therein specified:

" Whereas, by an act of Congress entitled ' An Act to supply deficiencies in the appropriations for the service of the fiscal year ending the 30th day of June, 1852,' all payments of interest on the amount awarded Choctaw claimants under the 14th article of the treaty of Dancing Rabbit Creek for lands on which they resided, but which it is impossible to give them, shall- cease, and that the Secretary of the Interior be directed to pay said claimants the amount of the principal awards in each case respectively, and that an amount necessary for this purpose be appropriated, not exceeding the sum of $872,000; and that final payment and satisfaction of said awards shall

be first ratified and approved as a final release of all claims of such parties under the 14th article of said treaty, by the proper national authority of the Choctaws, in such form as shall be prescribed by the Secretary of the Interior : Now be it known, that the said general council of the Choctaw Nation do hereby ratify and approve the final payment and satisfaction of said awards, agreeably to the provisions of the act aforesaid, as a final release of the claims of such parties under the 14th article of said treaty."

On the 9th day of November, 1853, the legislative council of the Choctaw Nation provided for the appointment of a delegation which should represent said nation in the settlement of all the unsettled claims and demands of said nation or individual members thereof against the United States. The preamble to the joint resolution appointing that delegation recites that " the Choctaws were, and ever have been, dissatisfied with the manner in which the treaty of Dancing Rabbit Creek was made, owing to the many circumstances which were created to force them into it, and owing to the exceeding small and inadequate amount which was given as payment for their country ; " and that " a large number of claims on the United States, arising under the 14th and 19th and other articles of the treaty of 1830, are still remaining unpaid ; " and the said delegates were " clothed with full power to settle and dispose of, by treaty or otherwise, all and every claim and interest of the Choctaw people against the government of the United States, and to adjust and bring to a final close all unsettled business " between said people and the government of the United States.

This delegation opened negotiations with the United States, through the Commissioner of Indian Affairs, for a new treaty, by means of a communication in writing, dated on the 5th of April, 1854, which contained a general statement or survey of the condition of the relations then existing between the Choctaw Nation and the United States, and set out *seriatim* complaints against the government, especially for causes of dissatisfaction arising under the treaty of September 27, 1830, claiming that scarcely one of the stipulations of that treaty

had been carried out by the government, so as to do justice according to the intent of the treaty. They especially alleged that the laws passed for the examination of their claims under said treaty, and the 14th article thereof, prescribed a course of adjudication of so rigid and technical a character as necessarily to exclude many just claims; that many were compelled to remove because of the failure of the government to give them their rights under the said article, and that the law unjustly cut off such persons from the benefits of it; that the scrip issued under the law was paid in such a manner as to make it of but little value to the Indian; and that those who received anything received but a mere pittance. They contended that many claims existed unadjusted and unpaid under the 19th article, and proposed to make arrangement for final adjustment of all matters, national and individual, in a new treaty, by which the nation proposed to pay all individual claims under the 14th and 19th articles, and release the government of the United States from all responsibility on that account, because such claims were not susceptible of proof against the United States, but could be adjusted by the authorities of the nation, provided the nation could effect such a settlement with the United States as the Choctaw people desired. They claimed that under the treaty of September 27, 1830, the Choctaw Nation was entitled to the funds arising from the sale of lands ceded, after deducting the expenses of sale, and the debt mentioned in said treaty; that the government of the United States was a trustee for the Choctaw Nation in the sale of the lands ceded by that treaty, so that, after the payment of the expenses incident to the execution of the trust, the Indians were entitled to the remainder; and they proposed that the payment to the nation of such remainder should operate in law as a satisfaction of the individual claims under a new treaty.

Upon the basis of this communication the Commissioner of Indian Affairs instructed the agent of the United States for the Choctaws to make the requisite inquiry and investigation to ascertain the character and extent of their claims, and what arrangement was necessary to accomplish the object in

view.   The agent of the United States for the Choctaws submitted to the Commissioner of Indian Affairs, in answer to this reference, a paper containing a comparative estimate or approximate statement of the claims then asserted by the Choctaw commissioners, which statement had been furnished by the Choctaw delegation to said agent.   The aggregate amount of these claims so stated was $6,599,230, which it was proposed to settle on the principle of allowing the net proceeds of the sales of the lands ceded to the United States by the Choctaw Nation under the treaty of September 27, 1830, the whole showing the balance claimed to be due to the Choctaws to be $2,380,701.   The agent of the United States, in his communication to the Commissioner of Indian Affairs, referring to said statement, said: "I have exa~ined this statement carefully, and from the most reliable information I am possessed of, obtained in the Choctaw country and here, I am inclined to think that part of it, embracing the extent of the obligations under the treaty, is as nearly correct as it could be made at this date."

The amount of the obligations under the treaty, thus referred to, was placed in said statement at $6,599,230.   These negotiations between the Choctaw delegation and the executive authorities of the United States were conducted with reference to the accomplishment of the following objects:

1st.   That the United States should provide, in a new treaty. for an examination and settlement of all the claims of the Choctaws, whether national or individual, under the treaty of 1830, as specified in the letter of the Choctaw delegation to the Commissioner of Indian Affairs, dated April 5, 1854.

2d.   That the Choctaws should adjust their disputes with the Chickasaws; should lease to the United States all that portion of their common territory between the 98th and 100th degrees of west longitude, for the permanent settlement of the Wichita and such other bands of Indians as the United States might desire to locate therein; and should absolutely and forever quit claim and relinquish to the United States all their right, title, and interest in and to any and all lands west of the 100th degree of west longitude.

These negotiations resulted in the treaty of 1855, which was ratified by the Senate of the United States on the 21st of February, 1856, and proclaimed by the President on March 4th of the same year.   11 Stat. 611.   The preamble to that treaty recites that "the Choctaws contend that by a just and fair construction of the treaty of September 27, 1830, they are, of right, entitled to the net proceeds of the lands ceded by them to the United States under said treaty, and have proposed that the question of their right to the same, together with the whole subject-matter of their unsettled claims, whether national or individual, against the United States, arising under the various provisions of said treaty, shall be referred to the Senate of the United States for final adjudication and adjustment."

By the terms of that treaty, a division of their common lands was made between the Choctaws and the Chickasaws, and the Choctaws relinquished to the United States all their lands west of the 100th degree of west longitude, and the Choctaws and the Chickasaws together leased to the United States all that portion of their common territory west of the 98th degree of west longitude, for the permanent settlement of the Wichita and such other tribes or bands of Indians as the government of the United States might desire to locate therein.   The 11th and 12th articles of said treaty are as follows:

"ARTICLE 11. The government of the United States, not being prepared to assent to the claim set up under the treaty of September the twenty-seventh, eighteen hundred and thirty, and so earnestly contended for by the Choctaws as a rule of settlement, but justly appreciating the sacrifices, faithful services, and general good conduct of the Choctaw people, and being desirous that their rights and claims against the United States shall receive a just, fair, and liberal consideration, it is therefore stipulated that the following questions be submitted for adjudication to the Senate of the United States:

"First.   Whether the Choctaws are entitled to, or shall be allowed, the proceeds of the sale of the lands ceded by them to the United States by the treaty of September the twenty-

seventh, eighteen hundred and thirty, deducting therefrom the cost of their survey and sale, and all just and proper expenditures and payments under the provisions of said treaty; and, if so, what price per acre shall be allowed to the Choctaws for the lands remaining unsold, in order that a final settlement with them may be promptly effected. Or,

"Second. Whether the Choctaws shall be allowed a gross sum in further and full satisfaction of all their claims, national and individual, against the United States; and, if so, how much.

"ARTICLE 12. In case the Senate shall award to the Choctaws the net proceeds of the lands ceded as aforesaid, the same shall be received by them in full satisfaction of all their claims against the United States, whether national or individual, arising under any former treaty; and the Choctaws shall thereupon become liable and bound to pay all such individual claims as may be adjudged by the proper authorities of the tribe to be equitable and just — the settlement and payment to be made with the advice and under the direction of the United States agent for the tribe; and so much of the fund awarded by the Senate to the Choctaws, as the proper authorities thereof shall ascertain and determine to be necessary for the payment of the just liabilities of the tribe, shall, on their requisition, be paid over to them by the United States. But should the Senate allow a gross sum, in further and full satisfaction of all their claims, whether national or individual, against the United States, the same shall be accepted by the Choctaws, and they shall thereupon become liable for, and bound to pay, all the individual claims as aforesaid; it being expressly understood that the adjudication and decision of the Senate shall be final."

In pursuance of the eleventh article of the treaty, the questions submitted to the Senate of the United States were answered by a resolution of the Senate passed on the 9th of March, 1859, as follows:

"Resolved, That the Choctaws be allowed the proceeds of the sale of such lands as have been sold by the United States on the 1st day of January last, deducting therefrom the costs

of their survey and sale, and all proper expenditures and pay-ments under said treaty, excluding the reservations allowed and secured, and estimating the scrip issued in lieu of reserva-tions at the rate of $1.25 per acre ; and, further, that they be also allowed twelve and a half cents per acre for the residue of said lands."

In reference to this award of the Senate, the Court of Claims, in the finding of facts, says : " The consideration which was given by the Senate to the subject-matter so submitted to it by the said eleventh article of the said treaty, and to the evidence which was so presented to, and taken and considered by, the Senate, was full, fair, and impartial, and its adjudica-tion, as made under the said article, was not influenced or affected by, and was in no way or degree the result of, any fraud, corruption, partiality, and there is no evidence tending to show that it was the result of surprise or mistake on the part of the Senate, or any member thereof."

On the 9th of March, 1859, the Senate of the United States also adopted a resolution for the purpose of ascertaining the amount due the Choctaw Nation under their award, as follows : " Resolved, That the Secretary of the Interior cause an ac-count to be stated with the Choctaws showing what amount is due them according to the above prescribed principles of settle-ment, and report the same to Congress." And the Secretary of the Interior, in compliance with the mandate of said resolu-tion, did, on the 8th of May, 1860, transmit to Congress a statement of account with the Choctaw Nation. This account shows, as the proceeds of the sales of the Choctaw lands up to January 1, 1859, together with the residue of said lands unsold at that date, at twelve and one-half cents per acre, an amount in all of $8,078,614.80, from which was to be deducted the whole amount of charges, equal to $5,097,367.50, leaving a balance due to the Choctaws of $2,981,247.30.

On the 9th day of January, 1861, the Choctaw Nation, by its memorial addressed to Congress, demanded payment from the United States of the amount claimed to be due to it under said award. By the provisions of the act of March 2, 1861, the Indian appropriation act, 12 Stat. 238, there was paid to

the Choctaw Nation the sum of $250,000 on account of their claim. The bonds for the additional sum of $250,000, which were by that act directed to be issued and delivered to said Choctaw Nation on account of said claim, were never issued or delivered to it, although demand for the same was made upon the Secretary of the Treasury by them on the 4th of April, 1861.

Upon the findings of fact, the Court of Claims found a balance due the Choctaw Nation from the United States of $408,120.32, made up of various claims arising under the treaty of 1830, and for the value of land taken in fixing the boundary between the State of Arkansas and the Choctaw Nation, deducting the payment made, under the act of 1861, of $250,000. In reaching this conclusion the Court of Claims rejected the award of the Senate, under the treaty of 1855, as having no effect in law, and excluded the consideration of all claims covered by the release executed by the Choctaw Nation on November 6, 1852.

*Mr. John J. Weed, Mr. Jeremiah M. Wilson,* and *Mr. Samuel Shellabarger* for the Choctaw Nation.

*Mr. Assistant Attorney General Maury* and *Mr. Assistant Attorney General Howard* for the United States.

MR. JUSTICE MATTHEWS, after stating the case as above reported, delivered the opinion of the Court.

The general purpose of this suit is a judicial settlement of all existing controversies between the Choctaw Nation and the United States. The specific claims of the Choctaw Nation are stated in the petition in the alternative. It is claimed, in the first instance, that the award of the Senate, and the amount found due as a balance upon the account between the parties, stated upon the principles of that award, should either be enforced as a finality by the judgment of the court in the present case, or that, if not technically enforceable as an award, it still furnishes a rule for an equitable settlement of the differences between the parties. But, in the second place, it is claimed that if the award cannot be considered in either of these lights, then the whole controversy and all questions in-

volved in it, from the beginning, under any of the treaties between the parties, are open for investigation and decision upon their original merits. And under this head the Choctaw Nation claim compensation for various breaches, on the part of the United States, of the treaty of September 27, 1830, and, in general, such a failure on its part to comply with its provisions, as in substance deprived the Choctaw Nation of all the benefits intended to be conferred by it, for which it is claimed they are entitled to an equitable equivalent as compensation.

In respect to so much of the petitioner's case as rests upon specific failures to comply with the provisions of article 14 of that treaty, as to those Choctaw heads of families who claimed reservations within its terms and did not receive them, the government of the United States relies upon the release executed by the Choctaw Nation in pursuance of the requirements of the act of July 21, 1852, under which a payment of $872,000 was made in satisfaction of the amounts awarded the Choctaw claimants under that article of the treaty of 1830.

The Court of Claims, as it appears, declined to give any legal effect whatever to the award made by the Senate under the treaty of 1855, feeling constrained to that conclusion by the terms of the act of March 3, 1881, conferring jurisdiction upon it in this suit, and on the other hand, it gave all the effect claimed by the United States for the release under the act of 1852. Its judgment in favor of the Choctaw Nation was made up as follows:

For claims under the 14th article of the treaty of
   1830, not covered by the release of 1852 . . $417,656.00
For claims under the 19th article of the treaty of
   1830 . . . . . . . . . . . . . . . . 42,920.00
For land taken in fixing the boundary of the
   State of Arkansas and the Choctaw Nation . 68,102.00
For transportation and subsistence under the
   treaty of 1830 . . . . . . . . . . . . . 51,993.00
For unpaid annuities . . . . . . . . . . . 59,449.32
For guns, ammunition, &c. . . . . . . . . . 18,000.00
     Total . . . . . . . . . . . . . . $658,120.32

And it credited the balance thus found due with a payment made under the act of March 2, 1861, of $250,000.

In reviewing the controversy between the parties presented by this record, it is important and necessary to consider and dispose of some preliminary questions. The first relates to the character of the parties, and the nature of the relation they sustain to each other. The United States is a sovereign nation, not suable in any court except by its own consent, and upon such terms and conditions as may accompany that consent, and is not subject to any municipal law. Its government is limited only by its own Constitution, and the nation is subject to no law but the law of nations. On the other hand, the Choctaw Nation falls within the description in the terms of our Constitution, not of an independent state or sovereign nation, but of an Indian tribe. As such, it stands in a peculiar relation to the United States. It was capable under the terms of the Constitution of entering into treaty relations with the government of the United States, although, from the nature of the case, subject to the power and authority of the laws of the United States when Congress should choose, as it did determine in the act of March 3, 1871, embodied in § 2079 of the Revised Statutes, to exert its legislative power.

As was said by this court recently in the case of the *United States* v. *Kagama*, 118 U. S. 375, 383: "These Indian tribes *are* the wards of the nation; they are communities *dependent* on the United States; dependent largely for their daily food; dependent for their political rights. They owe no allegiance to the States and receive from them no protection. Because of the local ill-feeling, the people of the States where they are found are often their deadliest enemies. From their very weakness and helplessness, so largely due to the course of dealing of the Federal Government with them, and the treaties in which it has been promised, there arises the duty of protection, and with it the power. This has always been recognized by the Executive, and by Congress, and by this court, whenever the question has arisen."

It had accordingly been said in the case of *Worcester* v. *Georgia*, 6 Pet. 515, 582: "The language used in treaties with

the Indians should never be construed to their prejudice. If words be made use of which are susceptible of a more extended meaning than their plain import, as connected with the tenor of the treaty, they should be considered as used only in the latter sense. . . . How the words of the treaty were understood by this unlettered people, rather than their critical meaning, should form the rule of construction."

The recognized relation between the parties to this controversy, therefore, is that between a superior and an inferior, whereby the latter is placed under the care and control of the former, and which, while it authorizes the adoption on the part of the United States of such policy as their own public interests may dictate, recognizes, on the other hand, such an interpretation of their acts and promises as justice and reason demand in all cases where power is exerted by the strong over those to whom they owe care and protection. The parties are not on an equal footing, and that inequality is to be made good by the superior justice which looks only to the substance of the right, without regard to technical rules framed under a system of municipal jurisprudence, formulating the rights and obligations of private persons, equally subject to the same laws.

The rules to be applied in the present case are those which govern public treaties, which, even in case of controversies between nations equally independent, are not to be read as rigidly as documents between private persons governed by a system of technical law, but in the light of that larger reason which constitutes the spirit of the law of nations. And it is the treaties made between the United States and the Choctaw Nation, holding such a relation, the assumptions of fact and of right which they presuppose, the acts and conduct of the parties under them, which constitute the material for settling the controversies which have arisen under them. The rule of interpretation already stated, as arising out of the nature and relation of the parties, is sanctioned and adopted by the express terms of the treaties themselves. In the 11th article of the treaty of 1855, the government of the United States expresses itself as being desirous that the rights and claims of the Choctaw people against the United States "shall receive a just, fair, and liberal consideration."

The language of the act of March 3, 1881, conferring juris-
diction in the present case, also requires construction. It con-
fers jurisdiction upon the Court of Claims to try all questions
of difference arising out of treaty stipulations with the Choctaw
Nation, and to render judgment thereon. How far the settle-
ment of these differences is to be affected by the various acts
of Congress referred to in the pleadings and findings of fact
made by the Court of Claims, and which were passed pro-
fessedly in execution of treaty obligations on the part of the
United States, must be determined. These acts of Congress,
in one aspect, have the force of law, because Congress has full
power of legislation over the subject; but, in so far as they
may have proceeded upon insufficient or incorrect interpreta-
tions of the treaty rights of the Choctaw Nation, or in so far
as they may have attempted to modify or disregard those
rights, they form the very subjects of complaint on the part
of the Choctaw Nation, whose allegation is, that the United
States, by these very statutes, as in other particulars, have
broken their treaty obligations. Where, in professed pursu-
ance of treaties, these statutes have conferred valuable benefits
upon the Choctaw Nation, which the latter have accepted,
they partake of the nature of agreements — the acceptance of
the benefit, coupled with the condition, implying an assent on
the part of the recipient to the condition, unless that implica-
tion is rebutted by other and sufficient circumstances. Under
the terms of the act of March 3, 1881, in exercising the juris-
diction thereby conferred, the Court of Claims is empowered
to review the entire question of differences *de novo*, which may
be interpreted to imply that the whole matter was opened from
the beginning, with the view of determining what the original
treaty rights of the Choctaw Nation were, and how far they
have been performed by the United States in its various trans-
actions with them, including the acts done under the authority
of the statutes referred to. The meaning of this clause becomes
most important, however, in connection with the question, how
the court is authorized to deal with the award made by the
Senate of the United States in pursuance of the treaty of 1855.

It is contended, on the part of the Choctaw Nation, that

that award is final and conclusive, and in support of that contention reference is made to the express provisions of the treaty of 1855. It is recited in the preamble of that treaty, that the Choctaws have proposed that their claims against the United States, arising under the various provisions of the treaty of September 27, 1830, shall be referred to the Senate of the United States for final adjudication and adjustment; and by the terms of the 12th article of the treaty it is declared to be "expressly understood that the adjudication and decision of the Senate shall be final;" and the right to insist upon the conclusive nature of this award, it is said, is a treaty right in favor of the Choctaw Nation.

On the other hand, it is declared by the act of March 3, 1881, that, in the exercise of its jurisdiction to try this case, the Court of Claims "shall not be estopped by any action had or award made by the Senate of the United States in pursuance of the treaty of 1855;" and it is insisted, on behalf of the United States, that this language is inconsistent with the idea that the court should give to that award any legal effect whatever. And this construction is supposed to be rendered necessary by the previous clause, which grants power to the court to review the entire question of differences *de novo;* for it is said that the court cannot review the question of differences *de novo*, that is, from the beginning, and as if they were new and had freshly arisen, if it gives any effect to a determination of the Senate, which it is claimed operates as *res judicata*, foreclosing further inquiry into the merits of the very questions to be reviewed.

If the words conferring the power to review the question of differences *de novo* are permitted to have that force, it is difficult to understand how the release made by the Choctaw Nation in pursuance of the act of Congress of July 21, 1852, should stand in the way of a reconsideration of the claims covered by it. That act of Congress, it is true, declares that the final payment and satisfaction of the sum thereby appropriated and paid, should, when ratified and approved by the proper national authority of the Choctaws, operate as a final release of all claims of those to whom such payments are

made, under the 14th article of the treaty of September 27, 1830. But whether that payment was a just and fair extinguishment of those claims, according to the terms of that treaty, was one of the very questions in dispute. And it is not unreasonable to contend, as it is contended on behalf of the Choctaw Nation, that the effect of that release should be considered in view of the circumstances under which it was executed, and in reference to which the Court of Claims has found, in the 16th finding, that " the claimants under the 14th article, the said Choctaw heads of families and their children, were reduced to a helpless condition of want, which rendered it practically impossible for them to contend with the United States in their requirement that the said Choctaw heads of families should accept and receive the scrip provided to be issued to them in lieu of the reservations by the act of 1842; and the said scrip and the money paid to redeem the same were taken and accepted because they were powerless to enforce any demands against, or impose any conditions upon, the United States."

However this may be, the language of the act of March 3, 1881, in reference to the award made by the Senate under the treaty of 1855, does not abrogate it, and does not require, as a condition of the exercise of the jurisdiction conferred by the act, that the court should entirely disregard it, giving it no effect whatever. It merely says that the court shall not be estopped by any action had or award made by the Senate in pursuance of that treaty. The plain and literal meaning of this language is fully satisfied by holding that the award, considered as such, shall not, upon its face, be taken to be final and conclusive. There is nothing in the language to prevent the court from giving to that award effect as *prima facie* establishing the validity of the claim so far adjudged in favor of the Choctaw Nation, leaving to the representatives of the government in this litigation the right not only to question the validity of the award, as such, upon any such grounds as might or should invalidate awards ordinarily, either at law or in equity, but also to attack it upon the merits, as a finding unsupported by proof, or unjust and unfair in view of all the

circumstances, and on that account not to be enforced. In that view, so much effect only would be given to it as to cast the burden of disproving its justice and fairness upon the United States in this suit. In that light, and with that view, it has been attacked in argument by the counsel for the United States, upon the proof contained in the case.

In the first place, it is objected that the award did not agree with the submission, and under that head it is argued that the first question submitted for adjudication to the Senate was whether the Choctaws were entitled to the proceeds of the sale of the lands ceded by them to the United States by the treaty of September 27, 1830, and that there was no authority to allow to them such proceeds, unless the Senate should first find that they were entitled to them. And it is said that the Senate not only did not find that, as matter of law, the Choctaws were so entitled under the terms of the treaty of September 27, 1830, but that, according to the report of the Committee on Indian Affairs, which was adopted by the Senate in the passage of the resolutions which contain the award itself, their title to those proceeds, considered as matter of law, was denied. We do not, however, think that the words of the question submitted to the Senate by the treaty of 1855 are to be confined to a consideration of the question of a strict title to the proceeds of the sale of the lands, but that they plainly mean, whether the Choctaws, under all the circumstances, as a matter of justice and fair dealing, ought to receive such proceeds, whether as deducible from the terms of the treaty or as merely a fair compensation to be awarded to them for its breaches by the United States. The language of the question is in the alternative; it is whether the Choctaws are entitled to or *shall be allowed;* and it was sufficient, in our judgment, to satisfy the terms of the submission, for the Senate to declare, as it did, that the Choctaws should be allowed the proceeds of the sale of the lands sold by the United States which had been ceded by the Choctaws under the treaty of 1830; and we are, therefore, of opinion that the award cannot be avoided on this ground.

Second. It is next insisted that the award is invalid because

it is uncertain, inasmuch as while it determines that the Choctaws shall be allowed the proceeds of the sale of the lands ceded by the treaty of 1830, and at the rate of 12½ cents an acre for the residue, it does not ascertain what those proceeds and the value of the residue amount to in the aggregate. But the award itself provided the means of reducing this uncertainty by a reference to the Secretary of the Interior, who was directed to cause the account to be stated with the Choctaws, showing what amount was due them according to the principle of settlement embraced in the award. It is not disputed but that the Secretary of the Interior was enabled by the records of his office to state such an account, and that in fact he has stated it. This reference to the Secretary of the Interior for the mere purpose of an account cannot be considered as a delegation of authority by the Senate to adjudicate any of the questions which had been submitted to it by the agreement of the parties. The stating of the account was merely in execution of the judgment; the principle on which it should proceed was fully, clearly, and finally adjudged. Whatever exception might be taken to the account when rendered, would not be different from such as in the usual course of equity practice might be taken to the report of a master to whom was referred the statement of an account, the principles of which had been previously settled by a decree of the court fixing and establishing the rights of the parties.

*Third.* It is also said that the award is invalid for lack of proper notice to the United States of the intended action of the arbitrator before proceeding to the adjudication. When it is considered that the Senate of the United States was the arbitrator, constituting, as it does, a branch of the legislative as well as of the treaty making power of the government of the United States, it can hardly be contended that the United States had no notice of proceedings taken by the Senate in pursuance of laws or treaties made by the United States.

Whatever force might otherwise be supposed to reside in these objections to the validity of the award are further answered by a reference to the terms of the Indian appropriation act of March 2, 1861, 12 Stat. 238, which enacts as

follows : "For payment to the Choctaw nation or tribe of Indians, on account of their claim under the eleventh and twelfth articles of the treaty with said nation or tribe made the twenty-second of June, 1855, the sum of five hundred thousand dollars; two hundred and fifty thousand dollars of which sum shall be paid in money; and for the residue the Secretary of the Treasury shall cause to be issued to the proper authorities of the nation or tribe, on their requisition, bonds of the United States, authorized by law at the present session of Congress: *Provided*, that in the future adjustment of the claim of the Choctaws, under the treaty aforesaid, the said sum shall be charged against the said Indians."

This appropriation, and the payment which was made under it, would seem to have the effect of confirming the award of the Senate, for it makes an appropriation in part payment of it, and provides for the future adjustment of the claim of the Choctaws under it. It is true, as is insisted in argument, that no express mention is made in this act of the award, and the claim of the Choctaw Nation is described as one arising under the 11th and 12th articles of the treaty of 1855, but no possible claim could arise under those articles of that treaty in behalf of the Choctaw Nation, except one to insist upon the arbitration and to enforce the award made, in pursuance of their terms. The whole object and scope of those articles of the treaty is to provide for the submission to the arbitration of the Senate, and the execution of the award made under it. The future adjustment of the claims of the Choctaws mentioned in the proviso evidently refers to the division of the fund, ascertained by the report of the Secretary of the Interior, by which a portion was to be paid over to the nation for the satisfaction of individual claimants, and the remainder retained by the United States as a trust fund, according to the 13th article of the treaty of 1855.

It does not, therefore, give too much effect to the act of March 2, 1861, to treat it as an act of Congress confirming the validity of the Senate award. This view is very much strengthened by the terms of the act of June 23, 1874, from which it appears that at that recent date Congress intended to

treat the award of the Senate as valid and binding, and the report of the Secretary of the Interior as to the balance due to be final. The provision of that act, 18 Stat. 230, is as follows: "That the Secretary of the Treasury is hereby directed to inquire into the amounts of liabilities due from the Choctaw tribe of Indians to individuals, as referred to in articles twelve and thirteen of the treaty of June twenty-second, eighteen hundred and fifty-five, between the United States and the Choctaw and Chickasaw tribes of Indians, and to report the same to the next session of Congress, with a view of ascertaining what amounts, if any, should be deducted from the sum due from the United States to said Choctaw tribe, for the purpose of enabling the said tribe to pay its liabilities, and thereby to enable Congress to provide a fund to be held for educational and other purposes for said tribe, as provided for in article thirteen of the treaty aforesaid."

The only further question, then, which can be claimed to be left open for adjudication in this suit by the terms of the act of March 3, 1881, is, on the supposition that the award is *prima facie* evidence of the correctness of the claim thereby reduced to judgment, whether upon its merits it was fair, just, and equitable, as a settlement between the parties of the matters in controversy, having regard to all the circumstances of the case. As already declared, it is the right of the United States to question its validity by questioning its justice; at the same time, the burden of proof is upon them to establish, by affirmative proof, the considerations which ought to constrain this court, as a matter of justice, altogether to disregard it.

Proceeding, then, to review the whole questions of difference between the parties *de novo* for this purpose, we are led to the conclusion that the principle of settlement adjudged by the Senate in its award, in pursuance of the 11th article of the treaty of 1855, furnishes the nearest approximation to the justice and right of the case that, after this lapse of time, it is practicable for a judicial tribunal to reach. Our judgment to this effect is based upon the following considerations:

The situation and circumstances in which the parties were found at the time the treaty of September 27, 1830, was

entered into, were these: By the previous treaty of 1820, the policy of the United States therein declared, and the agreement between the parties, was "to promote the civilization of the Choctaw Indians, by the establishment of schools amongst them, and to perpetuate them as a nation by exchanging for a small part of their land here," that is, in Mississippi, "a country beyond the Mississippi River, where all who live by hunting and will not work may be collected and settled together." It was also recited that it was "desirable to the State of Mississippi to obtain a small part of the land belonging to said nation for the mutual accomodation of the parties." Accordingly, the Choctaws, by the treaty of 1820, ceded to the United States a portion only of their lands in Mississippi.

By the 2d article of the treaty it was declared that, "for and in consideration of the foregoing cession on the part of the Choctaw Nation, and in part satisfaction for the same, the commissioners of the United States, in behalf of said States," thereby ceded to said nation a tract of country west of the Mississippi River, the boundaries of which were described. It was also declared by article 4 of that treaty, that "the boundaries hereby established between the Choctaw Indians and the United States on this side of the Mississippi River shall remain without alteration until the period at which said nation shall become so civilized and enlightened as to be made citizens of the United States, and Congress shall lay off a limited parcel of land for the benefit of each family or individual in the nation."

By the treaty of January 20, 1825, it was further stipulated that the 4th article of the treaty of October 18, 1820, should be so modified as that Congress should not exercise the power of apportioning the lands for the benefit of each family or individual of the Choctaw Nation, and of bringing them under the laws of the United States, but with the consent of the Choctaw Nation. In the meantime, however, under the pressure of the demand for the settlement of the unoccupied lands of the State of Mississippi by emigrants from other States, the policy of the United States in respect to the Indian tribes still dwelling within its borders underwent a change, and it be-

came desirable by a new treaty to effect so far as practicable the removal of the whole body of the Choctaw Nation, as a tribe, from the limits of the State to the lands which had been ceded to them west of the Mississippi River. To carry out that policy the treaty of 1830 was negotiated.

By the 3d article of that treaty the Choctaw Nation of Indians ceded to the United States the entire country they owned and possessed east of the Mississippi River, and agreed to remove beyond the Mississippi River as early as practicable, so that as many as possible of their people, not exceeding one-half of the whole number, should depart during the falls of 1831 and 1832, and the residue follow during the succeeding fall of 1833. But, in order to induce the consent of the Choctaw Nation, as such, to the provisions of that treaty, the United States entered into the obligations already specified and contained in its subsequent articles, particularly articles 14, 15, and 19, by which large reservations of land were made, so that under article 14 the head of every Choctaw family who desired to remain and become a citizen of the United States was entitled to do so, and thereupon became entitled to a reservation of a section of 640 acres of land for himself, and an additional half-section for each unmarried child living with him over ten years of age, and an additional quarter-section for each child under ten years of age, to adjoin his own location; with the further provision, that if they resided upon said lands, intending to become citizens of the States, for five years after the ratification of the treaty, a grant in fee simple should issue to them. The Choctaws, it appears, were very reluctant to emigrate from their old homes to their new ones, and a very much larger number than was expected manifested an intention to avail themselves of those provisions of the treaty which entitled them to remain.

It is notorious as a historical fact, as it abundantly appears from the record in this case, that great pressure had to be brought to bear upon the Indians to effect their removal, and the whole treaty was evidently and purposely executed, not so much to secure to the Indians the rights for which they had stipulated, as to effectuate the policy of the United States in

regard to their removal. The most noticeable thing, upon a careful consideration of the terms of this treaty, is, that no money consideration is promised or paid for a cession of lands, the beneficial ownership of which is assumed to reside in the Choctaw Nation, and computed to amount to over ten millions of acres. It was not an exchange of lands east of the Mississippi River for lands west of that river. The latter tract had already been secured to them by its cession under the treaty of 1820.

It is true that by the 18th article of the treaty of 1830 it is provided that, "for the payment of the several amounts secured in this treaty, the lands hereby ceded are to remain a fund pledged to that purpose, until the debt shall be provided for and arranged. And, further, it is agreed that, in the construction of this treaty, wherever well-founded doubt shall arise, it shall be construed most favorably towards the Choctaws." The only money payments secured by the treaty, over and above the necessary expenditures in removing the Indians, in providing for their subsistence for twelve months after reaching their new homes, and paying for their cattle and their improvements, are, first, an annuity of $20,000 for twenty years, commencing after their removal to the west; and, second, the amount to be expended in the education of forty Choctaw youths for twenty years, and for the support of three teachers of schools for twenty years, together with the cost of erecting some public buildings, and furnishing blacksmiths, weapons, and agricultural implements, in addition to the several annuities and sums secured under former treaties to the Choctaw Nation and people. It is nowhere expressed in the treaty that these payments are to be made as the price of the lands ceded; and they are all only such expenditures as the government of the United States could well afford to incur for the mere purpose of executing its policy in reference to the removal of the Indians to their new homes. As a consideration for the value of the lands ceded by the treaty, they must be regarded as a meagre pittance.

It is, perhaps, impossible to interpret the language of this instrument, considered as a contract between parties standing

upon an equal footing and dealing at arm's length, as a conveyance of the legal title by the Choctaw Nation to the United States, to hold as trustee for the pecuniary benefit of the Choctaw people, and yet it is quite apparent that the only consideration for the transfer of the lands that can be considered as inuring to them, is the general advantage which they may be supposed to have derived from the faithful execution of the treaty on the part of the United States; and when, in that connection, it is considered that the treaty was not executed on the part of the United States according to its just intent and spirit, with a view to securing to the Choctaw people the very advantages which they had a right to expect would accrue to them under it, it would seem as though it were a case where they had lost their lands without receiving the promised equivalent. In such a case, there is a plain equity to enforce compensation, by requiring the party in default to account for all the pecuniary benefits it has actually derived from the lands themselves. This is the solid ground on which the justice of the award of the Senate of the United States under the treaty of 1855 seems to us fairly to stand.

The committee of the Senate which reported the resolutions adopted by that body as the award under the treaty of 1855 reached their conclusion upon the same premises. Their report discusses at length the various grounds on which the Choctaw Nation rightfully complained of the injurious character of the dealings of the United States with them under the treaty, and concludes as follows:

"It being thus impossible to ascertain to how much the Choctaws would be entitled, on a fair and liberal settlement, for the damage and loss sustained by them, it seems to the committee that the only practical mode of adjustment is to give them the net proceeds of their lands, not on the ground that the letter of the treaty entitles them to it, but that it is the only course by which justice can now be done them.

"And while, on the one hand, to award to the tribe the net proceeds of their lands, would surely be no *more* than just to them, because practically no regard is paid to actual value by

the United States in the sales of public lands; and undeniably the real market value of these lands which the Indians might have realized, if protected in their possession, was far greater than the price for which they actually sold; on the other hand, the United States would neither have lost, paid, nor expended anything whatever, but would only have refunded to the Choctaws the surplus remaining on hand of the proceeds of their own lands, after having repaid themselves every dollar expended for the benefit of the Choctaws; and that, after having had the use of this surplus for many years without interest, and when, according to the estimates of the General Land Office, it would really amount to little more than half of what might be recovered in a court of equity, if the case were one between individuals, as will appear by the comparative statement hereto appended.

"The committee accordingly report the following resolutions, and recommend that they be adopted and made the award and judgment of the Senate upon the questions submitted by the treaty of 1855."

The Secretary of the Interior found to be due to the Choctaw Nation, in his statement of account in conformity with the resolutions and decision of the Senate under the treaty of 1855, the sum of $2,981,247.30. This balance was reached by crediting them with the proceeds of the sales of the lands ceded by them under the treaty of September 27, 1830, made up to January 1, 1859, adding for the unsold residue of said lands their estimated value at $12\frac{1}{2}$ cents per acre, amounting to $8,078,614.80 in the aggregate. Against this, deductions were charged, as follows: First, the cost of the survey and sale of the lands at ten cents an acre; and, second, payments and expenditures under the treaty; the whole amounting to $5,097,367.50, resulting in the balance above stated. Some of the items charged as payments and expenditures in this account are objected to on the part of the Choctaw Nation in this suit, and we are asked to restate the account. If, however, we felt at liberty to enter into such an examination of this account, we see nothing in the evidence presented by the record to show that the items objected to

were not properly chargeable. The result, therefore, is to establish the balance found by the Secretary of the Interior as the true amount due, ascertained according to the principle adjudged by the Senate in its award, and which we have declared to be the equitable rule of settlement between the parties. From this is to be deducted the payment of $250,000 made under the act of March 2, 1861.

This disposes of all questions of difference involved in this suit arising under treaties prior to that of 1855, except for unpaid annuities, ascertained by the Court of Claims to amount to the sum of $59,449.32, which is to be included in the judgment.

There is, however, another controversy arising under the treaty of 1855. The first article of that treaty fixed definitely the boundary of the territory ceded to the Choctaw Nation by the treaty of 1820. It is found as a fact by the Court of Claims, that, in the location of the line which was surveyed under the authority of the United States, and fixed as the permanent boundary between the State of Arkansas and the Indian country by the act of Congress of March 3, 1875, 18 Stat. 476, the government made a mistake, whereby they embraced in the territory appropriated by the United States as part of the public lands, $136,204\frac{0.2}{100}$ acres of Indian lands, the value of which, as ascertained by the Court of Claims, is $68,102. This is a just and valid claim, for which the petitioner is entitled to recover.

The final result is that the Choctaw Nation is entitled to a judgment against the United States for the following sums: First, $2,981,247.30, subject to the deduction of $250,000 paid under the act of 1861; second, for unpaid annuities, $59,449.32; third, for lands taken in fixing the boundary between the State of Arkansas and the Choctaw Nation, $68,102.

*The judgment of the Court of Claims is, therefore, reversed, and the cause remanded to that court, with instructions to enter a judgment in conformity with this opinion.*

MR. CHIEF JUSTICE WAITE dissenting:

I regret to find myself unable to agree to this judgment. If the United States had authorized suit to be brought against

them on the Senate award, I should not have hesitated about giving judgment in favor of the Choctaw Nation, upon the facts now found by the court below, for the full amount due according to the statement of the Secretary of the Interior. That award has not, in my opinion, been abrogated by the bringing of this suit. It remains, so far as anything appears in this record, as valid and as binding today as it was when made. The United States have neglected to pay the amount awarded, but the Choctaw people have never, so far as this record shows, released them from their obligation to pay. On the contrary, it seems always to have been insisted upon.

This suit is not brought upon the award, but upon the treaties, and it is to be determined, in my opinion, according to the legal rights of the parties now existing as fixed by the treaties, without regard to anything that was done by the Senate under the treaty of 1855. The language of the jurisdictional statute is this: "The Court of Claims is hereby authorized to take jurisdiction of and try all questions of difference arising out of treaty stipulations with the Choctaw Nation, and render judgment thereon; power is hereby granted the said court to review the entire question of differences de novo, and it shall not be estopped by any action or award made by the Senate of the United States in pursuance of the treaty of 1855." This, as it seems to me, means no more than that the questions of difference are to be tried de novo, as far as the award is concerned. A judgment is to be rendered. This implies that the proceeding is to be judicial in its character, and that the judgment is to be in accordance with the principles governing the rights of parties in the administration of justice by a court. The Senate, however, were, by the treaty of 1855, made arbitrators, and they were invested with power to determine whether the Choctaws were "entitled" legally to the proceeds of their lands, and, if not, whether they ought, under all the circumstances of the case, to be "allowed" such proceeds. The Senate could consider and act upon the moral obligations of the United States, but neither we nor the Court of Claims can do more than enforce their legal liabilities.

What, then, are the legal obligations of the United States under the treaties at this time, leaving the Senate award entirely out of view? The jurisdictional statute neither waives nor abrogates the release which was executed under the act of July 21, 1852. The same is true of the treaty of 1855. By the act of 1852 payments were to be made in cash to claimants under the fourteenth article of the treaty of 1830, for the amount of the scrip which had been awarded under the act of August 23, 1842, but not delivered, provided "that the final payment and satisfaction of said awards shall be first ratified and approved as a final release of all claims of *such parties* under the fourteenth article." That release was executed on the 6th of November, 1852. The treaty of 1855 recites that "the Choctaws contend that, by a just and fair construction of the treaty of September 27, 1830, they are of right entitled to the net proceeds of the lands ceded by them to the United States under said treaty, and have proposed that the question of their right to the same, together with the whole subject-matter of *their unsettled claims*, whether national or individual, against the United States, arising under the various provisions of said treaty, shall be referred to the Senate of the United States for final adjudication and adjustment." In view of this recital, we are to construe Article XI of the treaty, which is in these words:

"The Government of the United States not being prepared to assent to the claim set up under the treaty of September the twenty-seventh, eighteen hundred and thirty, and so earnestly contended for by the Choctaws as a rule of settlement, but justly appreciating the sacrifices, faithful services, and general good conduct of the Choctaw people, and being desirous that their rights and claims against the United States shall receive just, fair, and liberal consideration, it is therefore stipulated that the following questions be submitted for adjudication to the Senate of the United States:

"First. Whether the Choctaws are entitled to, or shall be allowed, the proceeds of the sale of the lands ceded by them to the United States, &c.," or

"Second. Whether the Choctaws shall be allowed a gross

sum in further and full satisfaction of their claims, national and individual, against the United States; and, if so, how much."

Thus the whole matter was referred to the Senate to determine, 1, Whether the Choctaws were in law entitled to the proceeds of the sale of their lands, and, if not, then, 2, What, under the circumstances, would be a fair and liberal settlement of all the matters of difference, with the right under this branch of the submission to "allow" the Choctaws the proceeds, or a "gross sum" to be ascertained in some other way. The Senate decided that they were not entitled to the proceeds as a matter of right, but that, under all the circumstances, it would be fair and just to settle on that basis. Had the same power been granted to the Court of Claims, I should not hesitate to affirm a judgment to the full amount of the award if placed on that ground. But, as has been seen, the jurisdictional statute confines the jurisdiction of the courts in this suit to a determination of the legal rights of the parties. Under the treaty the Senate could do what was fair and just, but we can only adjudge according to law.

This court agrees with the Senate committee in deciding that the Choctaws were not *legally* entitled to the proceeds of the land. In that I concur. The only inquiry, then, is, how much must be paid for the violation of the treaty of 1830 by the United States. If the release stands, then there can only be a recovery for the *unsettled* claims of the Choctaws, national and individual. In my opinion, the release has not been invalidated as an instrument binding in law by the findings in the case. The United States may have taken advantage of the necessities of the Indians and exacted a hard bargain, but the bargain was made and both parties promptly carried it out. The Senate, under its powers, might take the hardship of this bargain into account and go behind the release, but, in my judgment, we cannot. All that remains, then, is to ascertain what is legally due from the United States on account of the national and individual claims not included in that settlement, and upon this I am entirely satisfied with what was done by the Court of Claims. I think the judgment should be affirmed.