Joseph **CHITTO** et al., Members, and as the Representatives of, and on Relation of, the Choctaw Indians East of the Mississippi River

v.

The **UNITED STATES**.

The **UNITED STATES**

v.

Joseph **CHITTO** et al., Members, and as the Representatives of, and on the Relation of, the Choctaw Indians East of the Mississippi River.

Appeal of the **CHOCTAW NATION** from Order of the Indian Claims Commission Denying Motion for Leave to Intervene.

Appeals Docket No. 2–55.

United States Court of Claims.

Jan. 31, 1956.

Robert C. Handwerk, Washington, D. C., for Joseph Chitto and others. William T. Weir, Philadelphia, Miss., was on the briefs.

Curtis C. Shears, Washington, D. C., with whom was Perry W. Morton, Asst. Atty. Gen., for the United States.

W. F. Semple, Tulsa, Okl., for Choctaw Nation.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

LITTLETON, Judge.

This case involves cross appeals from the final determination of the Indian Claims Commission entered in Commission Docket No. 52, February 3, 1955 (3 Ind.Cls.Com. 288), denying the petitioners' first and second alternative prayers for relief and awarding judgment in the sum of $417,656 on the third prayer. There is also before the court the appeal of the Choctaw Nation from the Commission's order of January 24, 1955, denying the Nation's motion for leave to intervene.

Petitioners below brought suit under Section 2 of the Indian Claims Commission Act, 60 Stat. 1049, 25 U.S.C.A. § 70a, as the "representatives of, and on the relation of, The Choctaw Indians East of the Mississippi River", alleging that, as the descendants of those Choctaw Indians who qualified for benefits under Article 14 of the Treaty of September 27, 1830, 7 Stat. 333, 335, they are entitled to an award representing the value of the land in Mississippi which their ancestors were entitled to but did not receive; or, in the alternative, that they are entitled to an award representing the value of the scrip certificates issued by the United States in lieu of said lands; or that judgment should be rendered in their favor in payment of the individual claims arising under Article 14 of the 1830 treaty in accordance with the obligations of the United States under the Treaty of June 22, 1855, 11 Stat. 611.

In denying petitioners' claims to the value of the land or scrip under Article 14 of the 1830 treaty, the Indian Claims Commission held that the rights of all Article 14 claimants had been finally determined in the case of The Choctaw Nation v. The United States, 21 Ct.Cl. 59, reversed 119 U.S. 1, 7 S.Ct. 75, 30 L.Ed. 306. The Indian Claims Commission interpreted the decision of the Supreme Court in that case as holding that all claims of individual Choctaws under Article 14 of the 1830 treaty must be denied except the claims of 191 heads of families who had qualified for Article 14 benefits but had received neither land nor scrip, and that such group of claimants were entitled to receive $417,656 out of the total award made to the Nation. The Indian Claims Commission held that the judgment of the Court of Claims entered on the mandate of the Supreme Court is *res judicata* on the issues raised by the instant claims of the petitioners for the value of the Article 14 land and scrip, and also as to the amount to which the 191 heads of families were entitled; but that since the Chitto group had, in the opinion of the Commission, established that no part of the Court of Claims judgment of $417,656 was ever paid to the individual descendants of the 191 heads of families, the Chitto group should have an award in that amount because the Government was under an absolute obligation to see to it that the award was actually paid over to the proper individual claimants.

The Chitto group, petitioners below, urge that while the Indian Claims Commission was correct in holding that the $417,656 judgment of the Court of Claims had never been paid to those enti-

tled thereto and judgment therefor should be awarded in that amount, the Commission erred in holding that the decisions of the Court of Claims and the Supreme Court, supra, were *res judicata* as to the issues involved in the first and second alternative prayers of the Chitto group petition.

The Government appeals from the final determination of the Indian Claims Commission awarding $417,656 to the Chitto group, urging that the Commission erred (1) in holding that the petitioners constituted an identifiable group of Indians entitled to bring suit under the Indian Claims Commission Act, supra; (2) in holding that the Government was liable for any possible failure of the Choctaw Nation to pay over the $417,656 judgment to the Article 14 individual claimants entitled thereto; and (3) in denying the Government's motion for a rehearing on the basis of newly discovered evidence allegedly tending to establish that the Choctaw Nation had actually made payments to the individual Article 14 claimants.

■ The Choctaw Nation appeals from the final order of the Indian Claims Commission denying the Nation's motion for leave to intervene, urging that under the Treaty of June 22, 1855, supra, the Choctaw Nation had the primary responsibility for seeing that the judgment of the Court of Claims was distributed among the various claimants entitled to a pro rata share thereof; that the Choctaw Nation is prepared to show from documentary and oral evidence that the Article 14 claimants actually received payment of the portion of the judgment to which they were entitled; that unless the Choctaw Nation is permitted to intervene, it will be adversely affected by a judgment rendered against the United States because the Government has indicated its intention to satisfy any such final judgment out of funds of the Choctaw Nation on deposit in the United States Treasury. In our opinion the Choctaw Nation had a sufficient interest in the claims made before the Commission to entitle it to intervene and its

appeal from the order of the Commission is sustained.

In order to understand the basis for the final determination of the Indian Claims Commission and to decide the various issues raised by the three appeals, it is necessary to consider the facts established by the record in this case and the effect of the decision of the Supreme Court, supra.

By the terms of the Treaty of October 18, 1820, 7 Stat. 210, the Choctaw Nation, then living in the State of Mississippi, ceded to the United States a portion of its land in that State in exchange for a tract of land west of the Mississippi River situated between the Arkansas and Red Rivers, "where all, who live by hunting and will not work, may be collected and settled together." Article 4 of that treaty provided that boundaries established between the Choctaw Indians and the United States east of the Mississippi River should remain unchanged until the Indians remaining in Mississippi should become so civilized as to be made citizens of the United States and that at that time Congress would lay off limited parcels of land in Mississippi for the benefit of each family or individual of the Nation.

By the Treaty of January 20, 1825, 7 Stat. 234, it was provided that Congress would not exercise its power of apportioning lands in Mississippi for the benefit of Choctaw families or individuals without the prior consent of the Choctaw Nation.

Because of the increasing demands for land by white settlers, the United States came to the conclusion that it would be best to remove the whole body of the Choctaw Nation to their land west of the Mississippi River and with that in mind, the Treaty of September 27, 1833, 7 Stat. 333, was negotiated. By the third article of that treaty the Choctaw Nation ceded to the United States all the lands which they owned east of the Mississippi River and agreed to remove to their lands beyond that river as soon as practicable. No provision was made for

payment for such ceded lands except to a limited extent in Article 19. In order to induce the Nation to consent to such cession and removal, the United States was forced to enter into certain stipulations on behalf of those Choctaw Indians who did not wish to leave their homes in Mississippi and also on behalf of other members of the Nation who were willing to remove but who had been living on land which they had improved and felt they should be paid for their improvements before removal.

Accordingly, Article 14 of the 1830 treaty provided that the head of every Choctaw family who desired to remain in Mississippi and become a citizen of the United States might do so and thereupon become entitled to a reservation of 640 acres of land for himself, an additional 320 acres for each unmarried child over ten years of age living with him, and an additional 180 acres for each child under ten years of age, the tracts to be adjacent in location. The article further provided that if the Indians resided on the land for five years after the date of ratification of the treaty, intending to become citizens of the United States, a grant in fee simple would be issued to them. The last sentence in the Article provided:

> "Persons who claim under this article shall not lose the privilege [sic] of a Choctaw citizen, but if they ever remove are not to be entitled to any portion of the Choctaw annuity."

Article 19 provided, among other things, that Choctaw heads of families who were willing to remove west and who had made improvements in their lands east, should be paid therefor at the rate of fifty cents per acre.

The treaty also provided for the payment of annuities to the tribe, the payment of removal expenses, payment for cattle which the United States agreed to buy, the education of a limited number of Choctaw children, the furnishing of blacksmiths and a millwright for a lim-ited time, and the furnishing of blankets, rifles and ammunition to each warrior who might remove west.

Although great pressure was brought on the Choctaws to induce their removal west, a relatively large number elected to remain in their old homes and take advantage of the provisions of Article 14. Practically all were prevented from securing their reservations by the corrupt and dishonest behavior of the United States agent authorized to receive their notices of intention to remain in Mississippi. As a result of the actions of this Government agent, only 143 heads of families actually succeeded in securing their reservations of land under Article 14 and approximately 1,200 other heads of families with their children were driven from their farms which were subsequently sold by the Government to white settlers.

On March 3, 1837, Congress passed an act, 5 Stat. 180, providing for the appointment of commissioners to investigate and adjust the claims of these unfortunate Mississippi Choctaws to their Article 14 reservations. The life of this commission was extended by subsequent acts, including the Act of August 23, 1842, 5 Stat. 513, which provided that in cases where it was determined that an Article 14 claimant was found entitled to a reservation of land for which a patent should have been issued but the land had already been sold to a white person by the United States, certificates of scrip should be issued to the Indian reservee for entry at private sale on any public land in Mississippi, Louisiana, Alabama, or Arkansas. The act provided that "'not more than one half of which [scrip] shall be delivered to said Indian *until after his removal to the Choctaw territory west of the Mississippi river'*". [Italics supplied.] Delivery of the scrip was entrusted to the Secretary of War who, despite the provision in the act that one-half of the scrip might be delivered prior to removal, made the removal of the claimants a condition precedent to the delivery of *any* part of the scrip certificates.

The commissioners appointed under the above acts found that approximately 1,150 heads of families had qualified for Article 14 reservations but that the land to which they were entitled and the improvements thereon had been sold to others by the Government. Consequently, certificates for approximately 700,080 acres of land, or one-half the total amount found due this group, were delivered to them, the scrip having a supposed value of $1.25 per acre. However, because the scrip was not delivered until the Indian claimant had moved west of the Mississippi where the scrip could not be used to purchase land, many of the owners of the scrip sold it for an average price of less than 17 cents per acre. The remaining half of the scrip was never delivered to the Indians, but pursuant to the Act of March 3, 1845, 5 Stat. 766, 777, was funded and carried interest of five percent to be paid annually to the individual reservees under Article 14 of the 1830 treaty, or to their heirs, the scrip receiving an arbitrary value of $1.-25 per acre. On July 21, 1852, Congress passed an act, 10 Stat. 15, 19, providing that after June 30, 1852, all payments of interest on the funded scrip should cease; that the Secretary of the Interior should pay the individual claimants the amount of the principal awarded in each case in an aggregate amount not to exceed $872,000, and that final payment and satisfaction of the awards should first be ratified and approved as a "final release of all claims of such parties under the fourteenth article of said treaty [1830], by the proper national authority of the Choctaws, * * *." Such a release was executed by the Choctaw Nation on November 6, 1852, and approximately $871,000 was paid to the 1,150 Article 14 heads of families who had been found entitled to scrip, or to their heirs or legal representatives.

The commissioners appointed to investigate the Article 14 claims also found that 191 heads of families had attempted to comply with the terms of Article 14 and were prevented from doing so by the actions of the Government. The commissioners denied their claims, however on the basis of a provision in the 1842 act, supra, which required, as the treaty did not, that the claimants must reside on their improvements for the full term of five years. These 191 claimants did not receive land or scrip.

Because of the dissatisfaction of the Choctaw Nation with the manner in which the Government had carried out its undertakings under the 1830 treaty generally, and under Articles 14 and 19 in particular, the Nation by its legislative assembly created a delgation to settle all unsettled business with the United States. On June 22, 1855, the Choctaw Nation and the United States entered into a treaty, 11 Stat. 611, 613, which provided, among other things, for the settlement and adjudication of all claims or demands of the Nation or individual members thereof as follows:

"Article 11. The government of the United States, not being prepared to assent to the claim set up under the treaty of September the twenty-seventh, eighteen hundred and thirty, and so earnestly contended for by the Choctaws as a rule of settlement, but justly appreciating the sacrifices, faithful services, and general good conduct of the Choctaw people, and being desirous that their rights and claims against the United States shall receive a just, fair, and liberal consideration, it is therefore stipulated that the following questions be submitted for adjudication to the Senate of the United States.

"First. Whether the Choctaws are entitled to, or shall be allowed, the proceeds of the sale of the lands ceded by them to the United States, by the treaty of September the twenty-seventh, eighteen hundred and thirty, deducting therefrom the cost of their survey and sale, and all just and proper expenditures and payments under the provisions of said treaty; and if so, what price per acre shall be allowed to the Choctaws for the lands remaining unsold, in order that a final settle-

ment with them may be promptly effected. Or,

"Second. Whether the Choctaws shall be allowed a gross sum in further and full satisfaction of all their claims national and individual against the United States; and, if so, how much.

"Article 12. In case the Senate shall award to the Choctaws the net proceeds of the lands, ceded as aforesaid, the same shall be received by them in full satisfaction of all their claims against the United States, whether national or individual, arising under any former treaty; and the Choctaws shall thereupon become liable and bound to pay all such individual claims as may be adjudged by the proper authorities of the tribe to be equitable and just—the settlement and payment to be made with the advice and under the direction of the United States agent for the tribe; and so much of the fund, awarded by the Senate to the Choctaws, as the proper authorities thereof shall ascertain and determine to be necessary for the payment of the just liabilities of the tribe, shall on their requisition be paid over to them by the United States. But should the Senate allow a gross sum, in further and full satisfaction of all their claims, whether national or individual, against the United States, the same shall be accepted by the Choctaws, and they shall thereupon become liable for, and bound to pay, all the individual claims as aforesaid; it being expressly understood that the adjudication and decision of the Senate shall be final."

Article 13 of this treaty provided that any balance remaining of the amount that should thereafter be awarded the Choctaw Nation by the Senate under Article 12 of the Treaty should, after satisfying the "just liabilities of the tribe" be held in trust for welfare and educational purposes of the Choctaw people and their descendants.

Thereafter, the claims of the Choctaws were submitted to the Senate of the United States, and on February 15, 1859, the Committee on Indian Affairs submitted its report and resolutions. The report discussed at length the various wrongs done the Nation by the United States under the 1830 treaty and concluded that the United States had defaulted in its obligations under Articles 14 and 19, as well as under certain other articles of the treaty. With respect to the Article 14 claims, the Senate found that the scrip and cash paid to the 1150 Article 14 claimants who had qualified for land but had never received it, did not adequately compensate those individual heads of families and that they were clearly entitled in equity and justice to an additional amount for the damage and loss sustained by them.[1]

1. The Senate Report, at p. 15, stated as follows:

" * * * These 1,150 families lost their reservations, their homes, farms, and improvements altogether, and exclusively in consequence of the acts of omission or commission of the officers of the United States. They were therefore entitled, in justice, to a *full* and complete indemnity. Their lands, partly improved, and naturally selected by them for their superior *advantages of soil and situation*, were worth, probably, much more than $1.25 per acre; perhaps, on an average, not less than five dollars and much of it still more.

"Evidently to affix an arbitrary, uniform price, and that the minimum price of public lands, on the lands and home- steads thus lost to the parties, and to compel them to take that minimum price or nothing, was no indemnity, even if the amount had been presently paid them in money. It certainly did not proceed upon the principle of ascertaining the true and real amount of their loss, and paying them that. If it was in any exceptional case really an indemnity, that result was of course accidental. That the United States chose to sell their lands for much less than their value, as it in no way lessened their loss, so it in no way set a limit to their right to indemnity.

"For example: In one case the claimant 'had a house and field in Patickfah, where he resided until four years after the treaty, when a white man (Waters)

The Senate also found that 191 heads of families had qualified for reservations under Article 14 and had received neither land, scrip nor money and were therefore entitled to be compensated for their losses.

On the question of the actual value of the *land* and *improvements* which were lost by the Article 14 claimants the Senate stated at p. 15 of its report:

"Of course, it would at this remote day be utterly impracticable to ascertain the actual and real value of the improvements or lands which were the actual loss of the parties; and as to interest, the very magnitude of the item, exceeding, as it would in the aggregate, a million of dollars, would be likely to prove an insuperable bar to its allowance. If the lands and improvements of the reservees were worth, on an average, five dollars an acre, the difference between their value and their price at $1.25 an acre was over five millions of dollars."

On the problem of estimating the losses in the sale of *scrip*, the Senate stated at pages 15 and 16 of its report:

"Similar difficulties occur in considering the losses in the sale of scrip. In strict justice, it should be remembered that this scrip was made to serve a double purpose. It was used in compensation for land claims, and also as an inducement to emigrate to the Indian territory west, where most of it was delivered where it could not be located, and where, consequently, it was comparatively worthless. The Indian had either to sell it at a point remote from any market, or keep it as so much waste paper. Thus the service the scrip was required to perform as an aid to emigration lessened its value to the claimant. How far this cause operated in reducing the price below the regular market value, what that market value was, or how much the great body of the claimants really lost, are points which cannot now be determined. There is no doubt that the loss fairly chargeable to the government is considerable, but it would be impossible to fix the amount correctly."

The Senate then pointed out the difficulties of estimating the exact losses suffered by the Article 19 claimants and by claimants under other articles, and it concluded that the fairest method of awarding compensation would be to pay the Choctaw Nation the "net proceeds" received by the Government for the Choctaw lands:

"It being thus impossible to ascertain to how much the Choctaws would be entitled, on a fair and liberal settlement, for the damage and loss sustained by them, it seems to the committee that the only practicable mode of adjustment is to give them the net proceeds of their lands, not on the ground that the letter of the treaty entitles them to it, but that it is the only course by which justice can now be done them." [Senate Report, p. 17.]

---

drove him off.' His land was sold August 25, 1835. His claim was allowed in 1846 by the late Governor Marcy who was then Secretary of War, and scrip was issued to him. It does not appear what he received for the scrip; but admitting that he realized $1.25 in money for every acre, it was still no sufficient indemnity. What he was entitled to was the undisturbed possession of his land and the right to sell it to whom, when, and at such price as he pleased. To turn him out of doors by selling it as public land in 1835, to retain the proceeds of sale for eleven years, and then pay them over to him without any allowance for the delay or the use of the money, or for the value of his improvements, or that of the land over and above the sum for which it sold, was very far from doing complete justice.

"By this mode of compensation, all claim was excluded for the value of the *improvements* of the parties, their clearings, buildings, orchards, and the like. Not a dollar was allowed for that; but only the minimum price of unimproved public lands. And no attempt was made to ascertain the *true* value of the lands themselves. * * *"

In the subsequent Senate Resolution, the two propositions submitted to the Senate by the Treaty of 1855, supra, were recited, and it was then resolved that an award be made on the basis of the first, i. e., the "net proceeds" proposition. The resolution making the award was in the precise terms of Article 11 of the 1855 treaty. It awarded the Nation the proceeds of the sale of lands sold by the United States, deducting therefrom the cost of survey and sale, and all proper expenditures and payments under the 1830 treaty. The resolution also provided that all reservations allowed and secured, or the scrip issued in lieu of reservation, should be taken into account at an estimated price of $1.25 per acre.

The Senate further resolved that the Secretary of the Interior should cause an account to be stated with the Choctaw Nation showing the amount due it according to the principles set forth in the resolution of the Senate.

The Secretary of the Interior stated an account in conformity with the resolutions and decision of the Senate by crediting the Nation with the proceeds of the sales of the lands ceded by them under the 1830 treaty, made up to January 1, 1859, adding an amount thereto for the unsold residue of such lands at the estimated value of 12½ cents per acre, the total amounting to $8,078,614.80, and deducting therefrom (1) the cost of the survey and sale of the lands at ten cents an acre; (2) payments and expenditures made under the treaty, including the value of reservations actually allowed, and the value of the scrip issued in lieu of reservations not allowed, at the rate of $1.25 per acre, all as provided in the Senate resolution. This resulted in total deductions of $5,097,367.50. The final award was thus $2,981,247.30.

Following the Senate award, Congress, by an appropriation act of March 2, 1861, 12 Stat. 221, 238, made one payment thereunder in the sum of $250,000, but failed to make any further payments. By the act of March 3, 1881, 21 Stat. 504, the Court of Claims was granted jurisdiction to "try all questions of difference arising out of treaty stipulations with the Choctaw Nation, and to render judgment thereon; * * *." The jurisdictional act provided that the Court of Claims might review the entire question of differences de novo and should not be estopped by the Senate report and award made under the treaty of 1855.

The Choctaw Nation filed its petition in this court asking for judgment on the basis of the Senate award, after certain alleged errors had been corrected in the account stated by the Secretary of the Interior, or, in case the court should set aside the Senate award, judgment for the value of the Article 14 land plus interest thereon, or judgment for the proceeds received by the United States for Choctaw lands sold on the basis of a new accounting. In its decision, reported in 21 Ct. Cl. 59, this court held that the 1881 jurisdictional act deprived the court of the power to give any legal effect to the Senate award made under the 1855 treaty, accordingly, the court proceeded to consider all claims de novo.

The court rejected the claims made on behalf of the 1150 Article 14 claimants who had received scrip and money instead of land, holding that they were bound by the release signed by the Choctaw Nation under the Act of 1852. The court further held that the 191 heads of families who had not received land or scrip to which they were entitled under Article 14 of the 1830 treaty, were not bound by the release and should have judgment for the value of the land they lost at the rate of $1.85 per acre, or a total of $417,656; that the claimants under Article 19 were entitled to $42,920; that $68,102 should be awarded the tribe for land taken by the United States as the result of an erroneous survey, and certain other sums awarded for transportation and subsistence under the 1830 treaty, for unpaid annuities, and for guns and ammunitions promised and not delivered to the Nation.

On cross appeals by the parties to the United States Supreme Court, the judgment of the Court of Claims was re-

versed, 119 U.S. 1, 7 S.Ct. 75, 30 L.Ed. 306. The Supreme Court held that the 1881 act operated to reopen the Senate award and the questions decided by it, only so far as it cast upon the Government the burden of disproving the justness and fairness of the award. The Supreme Court held further that the award of the Senate furnished the nearest approximation to the justice and right of the case which it was possible, after a lapse of time, for any court to reach. The Supreme Court thereupon held that the Senate award *rather than the facts found by the Court of Claims* should be the basis for judgment on the subject in dispute, except in the case of the Court of Claims' finding on the amount of unpaid annuities, ($59,449.32) and the court's finding as to the value of lands taken under the erroneous survey ($69,102).

The decision of the Supreme Court, thus had the effect of completely reversing the holding and judgment of the Court of Claims (1) that the 1,150 heads of families who received scrip under Article 14 of the 1830 treaty, were bound by the 1852 release and therefore entitled to nothing; and (2) that the 191 heads of families who received nothing under Article 14 were entitled to a fixed amount, i. e. $417,656, as compensation for the land they should have received. *Both* groups were held to be entitled to share in the final judgment of $2,858,798.62 entered in the case which was based on the Senate award plus the two items of unpaid annuities and land taken by erroneous survey.

In arriving at the conclusion that the Chitto group were entitled to recover $417,656 as descendants of the 191 heads of families who were entitled to but never received land, scrip or money under Article 14 of the 1830 treaty, we are of the opinion that the Indian Claims Commission made two primary errors. First, we think that the judgment of the Court of Claims, entered on mandate of the Supreme Court, did not award any specific amount to Article 14 claimants, nor did the Supreme Court affirm the finding of the Court of Claims that of all the Article 14 claimants, *only* the 191 heads of families who received neither land, scrip nor money were entitled to any part of the judgment entered. On the contrary, the Supreme Court reversed the holdings and judgment of the Court of Claims, and necessarily, the findings on which they were based, including the holdings that those Article 14 claimants who had received money and scrip in lieu of land and on whose behalf the Choctaw Nation had executed a release on November 6, 1852, were entitled to nothing; and that the 191 heads of families who had not received land, scrip or money, were entitled to receive a fixed amount representing the value of the land they should have received, as of 1831.

The Supreme Court held that the Court of Claims should have adopted the February 15, 1859, report and award of the Senate made pursuant to the Treaty of June 22, 1855, which report stated that not only the 191 heads of families who had received nothing, but also the 1,150 heads of families who had received scrip and money in lieu of land, had failed to receive the full value of the benefits intended to be conferred on them by Article 14 of the 1830 treaty; that because of the difficulty of determining just how much those benefits were worth in addition to what the 1,150 had actually received by way of scrip and money. the fairest method of compensating the 1,150 heads of families and the 191 heads of families, was to permit them all to share in the net proceeds of the sale of the lands of the Nation in Mississippi which the tribe had ceded to the Government in 1830. The Supreme Court accordingly ordered the Court of Claims to enter a judgment for the Choctaw Nation in the exact amount of the Senate award, plus certain other items found by the Court of Claims and concurred in by the Supreme Court to be justly due the Choctaw Nation.

From the above it follows that if the judgment of the Court of Claims should have been paid by the Government to

the Article 14 claimants directly, or if the Government was under an obligation to absolutely insure that the Article 14 claimants received their pro rata shares of that judgment, and failed to do so, then a much larger group than the descendants of the 191 heads of families would now be entitled to an award from the Indian Claims Commission.

■■ However, it is our opinion that under the pleadings and on the record in this case, the petitioners below (the Chitto group) have failed to establish any right of recovery on the part of descendants of either the 191 heads of families or the 1,150 heads of families, because it has been neither alleged nor proved that the Government failed to do all that it was required in law or in good conscience to do by way of assuring that the individual Article 14 claimants received their pro rata share of the net proceeds judgment. In addition, we are of the opinion that the Commission's finding that none of the 191 heads of families or their descendants ever received any part of the net proceeds judgment is not supported by substantial evidence.

In holding that the Government was under a duty to insure that whatever was due the Article 14 claimants out of the Court of Claims judgment was in fact paid over to them, the Indian Claims Commission relies on the language of Article 12 of the 1855 treaty which provides in part as follows:

"In case the Senate shall award to the Choctaws the net proceeds of the lands, * * * the same shall be received by them in full satisfaction of all their claims against the United States, whether national or individual, arising under any former treaty; and the Choctaws shall thereupon become liable and bound to pay all such individual claims as may be adjudged by the proper authorities of the tribe to be equitable and just—*the settlement and payment to be made with the advice and under the direction of the Unit-*

*ed States agent for the tribe; * * *.*" [Italics supplied.]

■ It is undisputed that the final award of the Court of Claims was paid to the proper officials of the Choctaw Nation as required by the above quoted treaty article in connection with the Senate award. The 1855 treaty was with the Choctaw Nation and when Article 12 speaks of the "Choctaws" it has reference to the Choctaw Nation. Neither the special jurisdictional act of March 3, 1881, nor the 1855 treaty authorized payment to anyone but the Choctaw Nation.

In the 1855 treaty the Choctaw Nation agreed that it would accept payment from the United States of any award made by the Senate in full satisfaction of all of the claims which the tribe or its individual members had against the United States, and that the tribe would see to it that all individual claims were settled out of the award on a just and equitable basis. This included the claims of the petitioners in this case. The Choctaw Nation further agreed that it would make such settlements and payments with the advice and under the direction of the United States agent for the Tribe. Nowhere in the article or elsewhere in the treaty or Act of Congress is there a promise by the United States to the individual claimants that it would absolutely insure their receiving payment according to a just and equitable settlement. All the undertakings in above-quoted portion of Article 12 appear to us to run from the Choctaw Tribe to the United States and consist of an agreement to accept the award in settlement of all national and individual claims of the Choctaws against the United States, and to become liable as a Tribe for the payment of individual claims, but to consult with the United States agent for the Tribe in carrying out such undertakings, and to proceed in such manner as he might direct. This cannot be interpreted as a promise by the United States that it would itself pay the individual claimants or that its agent would himself do so or personally see to it that

each individual claimant was awarded the proper amount by the Tribe and paid that amount. Neither the Senate award nor the judgment of the Court of Claims entered on mandate of the Supreme Court determined the separate amounts that should go to individual claimants, that being left up to the proper authorities of the Choctaw Nation.

There is nothing in the record in this case to establish or to indicate that the United States agent induced or even knew of any unfair settlements or denials of just individual claims, or knew or had any part in, any failure on the part of the Tribe to pay individual claimants justly entitled to share in the award.

The record before the Commission also fails to establish the fact found by the Commission that the individual claimants under Article 14 entitled to share in the final judgment entered by the Court of Claims, as descendants of the 191 heads of families, were not in fact paid their share of such judgment. The Commission's finding that such claimants were not paid by the Choctaw Nation is supported only by evidence that no record of such individual payments exists in the records of the office of the United States Commissioner of Indian Affairs, Department of the Interior, or is shown by the report of the General Accounting Office. There is no evidence of fraudulent practices on the part of the authorities of the Choctaw Nation. The Commission also relies on a *dictum* expressed in the case of Jack Amos, et al. v. Choctaw Nation, issued by the United States Courts in the Indian Territory in Citizenship cases. That decision involved an appeal from a decision of the Dawes Commission concerning the right of citizenship in the Choctaw Nation of Jack Amos and others. The cases did not involve the questions presented here, and we can give the *dicta* no weight.

Statements by Government officials that Government records contain no evidence of payment to individual claimants under Article 14 from the Court of Claims judgment does not, we think, establish that such payments were not in fact made. As pointed out by the Government and by the Choctaw Nation, the Choctaw Nation was obligated to make such payments and records of such individual payments would be in the archives of the Choctaw Nation and not in the records of the Indian offices of the United States Government.[2]

2. At the time of the entry of the judgment of the Court of Claims on mandate of the Supreme Court, December 15, 1886, and for many years prior thereto, the Choctaw Nation, a civilized tribe of Indians, had a full tribal government organized along the lines of the Government of the United States. Immediately following the making of the net proceeds award by the United States Senate in 1859, the governing body of the Choctaw Nation passed an act creating a Choctaw Court of Claims to adjudicate the claims of individual claimants under the 1830 treaty, to audit those claims and pay out the money which should be appropriated by the United States Congress to individual claimants found by the Choctaw Court entitled to share in the net proceeds award. Although the United States Government, because of the commencement of the Civil War, made only one payment of $250,000 under that Senate award, the tribal claims court continued to adjudicate the claims of individual claimants. By the time of the passage of the 1881 jurisdictional act referring the matter of the Senate award to the United States Court of Claims, most of the individual claims had been adjudicated. Following the judgment of the United States Court of Claim in 1886, the General Council of the Choctaw Nation passed an act, November 6, 1888, providing for the creating of a new claims commission of three commissioners to ascertain the identity of the legal heirs of the individual claimants who had been found by the Choctaw Court of Claims to be entitled to share in the Senate award. This commission was authorized to issue certificates for the amount of the claims to the persons entitled thereto. It provided that the Indian Agent for the Five Civilized Tribes should be the Fiscal Agent for the tribe and pay the certificates out of the net proceeds judgment money. This tribal commission continued in existence until all individual claims were adjudicated and settled and the final

We think that in order to establish a cause of action and a right to recover from the United States in the instant case, petitioners had the burden of alleging and proving that they were entitled to be paid by the United States; that the Choctaw Nation, to which, under the terms of the 1855 treaty and the judgment of the Court of Claims on mandate of the Supreme Court, the amount of the judgment was paid, wrongfully refused to pay them, and that the United States under whose direction payments were made (see footnote 2), knew or should have known that the Choctaw Nation was wrongfully withholding payment from individual claimants rightfully entitled to such payments. In the absence of such allegations and of any proof to that effect, the Chitto group has failed to establish its right to any award whatsoever.

For the purposes of the record, the appeal of the Choctaw Nation is sustained and the decision of the Indian Claims Commission denying its petition to intervene is reversed.

We do not find it necessary to go into the question of whether or not the Chitto group is an identifiable group entitled to sue under the terms of the Indian Claims Commission Act, or the question of whether the Commission erred in refusing to grant the Government a rehearing on the question of payment.

The final determination and award of the Indian Claims Commission in favor of the petitioners below and its order denying the motion of the Choctaw Nation for leave to intervene are reversed, and the cause is remanded with instructions to enter an order permitting the intervention of the Choctaw Nation and to enter judgment dismissing the petition in conformity with this opinion.

JONES, Chief Judge, and LARAMORE, MADDEN and WHITAKER, Judges, concur.

report of the fiscal agent of the Choctaw Nation (acting under bond) was accepted in 1889 by the Choctaw governing body.

By that time the entire judgment had been paid out except for approximately $22,000.